THE STATE ex rel. ST. LOUIS, KANSAS CITY AND COLORADO RAILROAD COMPANY v. COOK, Secretary of State.

In Banc, January 6, 1903.

1. **Mandamus:** COURSE OF PROCEDURE: MOTION TO QUASH. Where a railroad company has brought a mandamus proceeding in the Supreme Court to compel the Secretary of State to issue to it a license to do business in this State, the regular course of procedure is to let the alternative writ issue and then raise questions arising on its face by a motion to quash. But if the defendant on the filing of the suit waives the issuance of the writ and demurs to the petition, and both sides prefer to present the issues in that form, the court will consider them.

2. **Judicial Knowledge:** STATE OF RAILROAD BUILDING. The court will take cognizance of the fact that several railroads had at a certain period built their railroad lines into this State, if it is a fact of common knowledge.

3. **Foreign Railroad Companies:** INCORPORATION FEES: STATUTE OF 1891. Prior to 1891 foreign railroad companies desiring to extend

their lines into this State were not required to pay an incorporation fee on their capital stock, nor did the act of that year impose any fees on so much of the lines of such companies as had prior thereto been built within this State. But as a condition of obtaining a license to continue to build their lines within this State, the Act of 1891 imposed "incorporating taxes and fees equal to those required of similar corporations formed within and under the laws of this State" on all the lines of foreign railroad companies thereafter to be built within this State, whether or not they had previously begun building their lines here.

4. ———: ———: ———: LINES PREVIOUSLY BEGUN. The building of a part of a foreign railroad corporation's road within this State prior to the passage of the Act of 1891 is not sufficient to exempt it entirely from the fees required by that act.

5. ———: CAPITALIZATION: $10,000 PER MILE. The law conclusively presumes against a foreign railroad company demanding the right to build a standard-gauge railroad within this State that its capital is not less than $10,000 per mile. If the lines it has already built in this State have cost a sum equal to its capital stock, then it must either elect to be confined to that number of miles, or pay incorporating fees at the rate of $10,000 per mile on each mile which by its charter it may construct within this State less the cost of the line already constructed.

6. ———: ———: CASE STATED. A company, incorporated under the laws of Kansas in 1887 for $20,000,000, for the purpose of constructing 900 miles of railroad, a part of which was to be within this State, built fifty miles thereof from St. Louis to Union at a cost of $1,600,000, before the Act of 1891, fixing a fee on foreign corporations for the privilege of continuing business in this State equal to the fee required of domestic corporations, went into effect. *Held*, that it must pay a fee for a license to do business in this State on so much of the mileage to be built in this State as is called for by its charter, at the rate of $10,000 a mile, less the cost of the fifty miles.

7. ———: CHARTER PRIVILEGES: HOW FAR INOPERATIVE. A foreign corporation admitted to do business in this State, either by comity or by express leave of the statute, can not transact any business which a domestic corporation of like character can not transact, even though its charter expressly gives it the right to transact such business. So that, if the charter of a foreign railroad company gives it the right to build and maintain telegraph and telephone lines along its road, it will not be denied a certificate to do a railroad business in this State on that account, but that grant of power, if denied by our law to such companies, will be treated simply as if it had not been made.

Mandamus.

WRIT DENIED.

*Jno. H. Overall* for relator.

(1)   If there was nothing in the statutes on the subject but the words quoted in respondent's brief, viz.: "to pay an incorporation tax or fee equal to those required of similar corporations formed within and under the laws of this State," respondent might possibly be correct.   But the statute says that such corporation "shall be required to pay into the treasury of this State upon the proportion of its capital stock represented by its property and business in Missouri."   The respondent says that relator has the right under its charter to build eight hundred and fifty miles of road in Missouri. Every other foreign corporation has the right to invest its entire capital stock in property and business in Missouri, and, if so, they must, under the law of 1891, pay a capitalization tax on their entire amount of capital stock, but they do not put it all into property and business in this State, and, hence, do not pay on their entire capital.   It might have been well for the Legislature to have required all foreign corporations to pay a capitalization tax on all their authorized capital stock, the same as domestic corporations, but the Legislature seemed to think otherwise and the Constitution has not given to any other person the right to pass laws for it.   How respondent gets at the number of miles of road plaintiff will finally build is not shown to the court, as it is equally unknown to relator.   (2)   It is declared by section 1025, Revised Statutes 1899, as follows: "Provided that the requirements of this article to pay incorporation tax or fee shall not apply to railroad companies which have heretofore built their lines of railway into or through this State."   The Legislature, acting consistently with the provisions and spirit of the Constitution, did not intend that the law should be retroactive and im-

pose upon plaintiff a back tax which the relator had no reason to expect when it invested sixteen hundred thousand dollars in the construction of its road in this State. It came into this State by the invitation of the laws of Missouri with which it fully complied and invested $1,600,000 in the building of its road in Missouri and thereby added so much to the wealth of the State. Railroad v. Lewright, 113 Mo. 660. If, as relator contends, its railroad was built into this State, it having been completed from St. Louis to Union prior to the date of the approval of the Act of 1891, then all it was required to do was to file its articles of association with the Secretary of State and pay him his filing fee. The law in this respect has not been changed from that date to this, and, therefore, if relator is now permitted to file its articles of association, it may do so upon paying to the Secretary of State his filing fee, all that was required by the act when it went into effect. It would not then have been required to pay a corporation tax because the law said and still says that a foreign corporation that has built its road into this State shall not be required to pay a capitalization tax. If by failure to file its articles of association at the time the law of 1891 went into effect, plaintiff is now required to pay a capitalization tax "upon the proportion of its capital stock represented by its property and business in Missouri," then it is not required to pay upon the proportion of its capital stock that it may under some remote possibility hereafter invest in Missouri, but such proportion as at present invested. (3) Relator suggests that the provision of its charter for the maintenance of a telegraph line is not for the purpose of organizing a telegraph company, but for the purpose of using appliances which may become necessary for the successful operation of its road. It is not alleged in respondent's answer that relator has a telegraph line or intends to have one. Nor is it true that it has such line or intends to build one. The government of its trains is controlled by the wires of the Western Union Telegraph Company.

*Edward C. Crow,* Attorney-General, and *Sam B. Jeffries,* Assistant Attorney-General, for the State.

(1)    The motion to quash should be sustained for the reason that the amended articles of the company show that it was organized under the laws of the State of Kansas, for the purpose of constructing, as proposed by its articles, eight hundred and fifty miles of railroad in the State of Missouri and only fifty miles in the State of Kansas, of which about forty miles were constructed or acquired in this State prior to the approval of the Act of 1891, and it is therefore, under the laws of Missouri, chargeable with a corporation tax on said eight hundred and fifty miles, at a valuation of not less than ten thousand dollars per mile, as required of railroads organized under the provisions of article 2, chapter 12, Revised Statutes 1899.    (2)    The motion to quash should be sustained for the further reason that as the charter of relator authorizes it to construct and maintain eight hundred and fifty miles of railroad in the State of Missouri, in order to obtain a certificate or license to do business in Missouri, and enjoy the rights and benefits set forth in its charter, it is required by section 1025, Revised Statutes 1899, to pay ''an incorporation tax or fee equal to those required of similar corporations formed within and under the laws of this State,'' to-wit, not less than ten thousand dollars for every mile of standard-gauge road constructed or proposed to be constructed, which upon the mileage authorized in Missouri amounts to $4,276.50.    It is the contention of the Secretary of State that this latter amount should be paid by the relator before it can receive a certificate of authority to transact business in Missouri. (3)    The petition of the relator shows that the road contemplated by its charter has not been finished and put in operation within ten years from the date claimed by it to have entered this State, and therefore, its powers to construct and operate the proposed road have ceased, saving and excepting the operation of that portion of its road which was finished and in operation at the end

of ten years from the date of its charter. Sec. 1161, R. S. 1899. Foreign corporations being subject "to all liabilities, restrictions and duties which are or may be imposed upon corporations or like character organized under the general laws of this State, they shall have no other or greater power." Sections 1024 and 1161, R. S. 1899.

VALLIANT, J.—The relator is a railroad company incorporated under the laws of Kansas. It has applied to the defendant, the Secretary of State, for a certificate to authorize it to do business as a foreign corporation in this State, as provided by section 1025, Revised Statutes 1899, but the application has been denied, on the ground, among others, that the relator has not paid incorporating taxes and fees equal to those required of similar corporations organized under the laws of this State as the statute requires, and this suit is brought to obtain a writ of mandamus to require the Secretary of State to issue the license.

The petition shows the following facts: That the relator was incorporated in Kansas in 1884, to construct and operate a standard-gauge railroad from a point in the western line of Seward county, Kansas, through certain counties named in Kansas and Missouri, to the Union Depot at Kansas City, thence through certain other counties in Missouri to the city of St. Louis. That in 1887 the charter was amended, increasing the number of directors and changing the line of the proposed road, beginning in the city of St. Louis and running through certain counties specified to Kansas City, with several other routes branching off from that and other branches, one of which was aimed to reach Fort Scott, Kansas, another Ottawa, Kansas, and another Girard, Kansas. That prior to April 21, 1891 (the date of the act prescribing the terms on which a foreign corporation is entitled to a license to do business in this State), relator "had built its line of railway into this State, having theretofore built its line of railway in this

State from the city of St. Louis to the town of Union, in Franklin county," and that the proportion of its capital stock represented by its property located and its business transacted in this State was $1,600,000, and that on February 11, 1902, the date of the application to the Secretary of State for a license, that proportion had increased by expenditures extending the road, to $1,939,000. That having thus built its road into this State, relator is entitled to the certificate and license upon paying the fee of $1.50 prescribed by law for issuing the same without paying any sum, as for the quasi-incorporating tax under the proviso to section 1025, which is: "that the requirements of this article to pay incorporation tax or fee shall not apply to railroad companies which have heretofore built their lines of railway into or through this State." That relator had duly tendered to the Secretary of State copies of its charter and the amendment thereto, together with the affidavits of its president showing its place of business in this State, the proportion of its capital stock as above specified employed here, and that it was not in any pool or trust, etc. That at the same time relator tendered to the Secretary of State the legal fee of $1.50 for issuing the certificate, and tendered for payment into the State treasury $825 as for the incorporating tax on $1,600,000 if it should be held that relator was liable for such tax on the amount of its capital stock invested in the road from St. Louis to Union, and the sum of $995 if it should be held that it was liable for such tax on the amount of its investment in this State up to the date of the application. That the Secretary of State refused these tenders and refused to issue the license. The prayer is for a writ of mandamus to require him to do so.

The defendant being informed of the filing of the suit, waived the issuance of an alternative writ, and demurred to the petition. The questions, therefore, for decision are those arising out of the petition and demurrer.

I. The regular course of procedure would have been to let the alternative writ issue and raise the ques-

tions arising on its face by a motion to quash, but as both sides have preferred to present the issues in this form, we will so consider them.

II.   The main ground on which the demurrer is rested, is, that on the facts stated in the petition, the relator is not entitled to the certificate or license demanded, because it has not paid into the State treasury the amount of the tax or fee that a railroad company asking to be incorporated under the laws of this State, with the same or similar rights, would be required to pay.

Under section 21 of article 10 of our Constitution, no corporation, unless formed solely for benevolent, religious, scientific or educational purposes, can be created under the laws of this State until the persons seeking to be incorporated shall "pay into the State treasury fifty dollars for the first fifty thousand dollars or less of capital stock, and a further sum of five dollars for every additional ten thousand dollars of its capital stock.   And no such corporation, company or association shall increase its capital stock without first paying into the treasury five dollars for every ten thousand dollars of increase."

Section 764, Revised Statutes 1879 (we quote from the revision of 1879, because that was the law when relator's rights accrued), prescribing the conditions upon which railroad companies may be incorporated, declares that the articles of association shall state among other things: "the amount of the capital stock of the company, which shall not be less than ten thousand dollars for every mile of standard or broad-gauge, nor less than five thousand dollars for every mile of narrow-gauge road constructed or proposed to be constructed," etc.

Section 782, *Id.*, confers on such corporations the right of way through the unimproved lands of the State and prescribes the mode of obtaining the right of way through the State's improved lands and lands belonging to cities and towns.

Sections 893, *Id.*, and following, make provisions

for the condemnation of private property for the use of the railroad company.

In addition to the comity under which foreign corporations are admitted to this State, section 790 of the same revision enacts: "Any railroad company duly incorporated and existing under the laws of an adjoining State of the United States, may extend, construct, maintain and operate its railroad into and through this State, and for that purpose shall possess and exercise all the rights, powers and privileges conferred by the general laws of this State upon railroad corporations organized thereunder, and shall be subject to all the duties, liabilities and provisions of the laws of this State concerning railroad corporations as fully as if incorporated in this State."

Under the generous invitation there extended, if a railroad company chartered under the laws of Kansas, owning a railroad in that State directed towards our border, desired to extend its road into or through the State, it was welcome to do so; the right of way through lands of the State was given, the power to condemn private property for railroad purposes was conferred and all other rights and privileges afforded a domestic railroad corporation were given, for all which no incorporation tax or fee was required. Acting upon that invitation a railroad company could have been incorporated under the laws of Kansas to build and operate a road from Fort Scott to St. Louis, with such meanders or branch routes through this State as the company might desire, covering, as the relator does, a line or lines of more than 800 miles, for which a domestic corporation would have to pay an incorporation fee estimated at $5 for every $10,000 on a capital of $8,000,000. This would seem to be an unjust discrimination against a domestic corporation, but as long as our Legislature was satisfied with the law and its effect, no one else could be heard to object. Under that law and before the amendments thereto presently noted, several railroad companies incorporated under the laws of other States had extended their roads across our borders and into

and through this State.

Such was the law when the relator came into this State with its Kansas charter and constructed that part of its road which is now in operation from St. Louis to Union, and so the law continued to be until 1891, and so it is to-day, except as changed by the Legislature in 1891 and 1895, by enactments which now constitute sections 1024 and 1025, Revised Statutes 1899. . The object of those enactments was to prescribe certain conditions to be observed by foreign corporations before they would be permitted to come into the State to transact business, or continue their business if they were already here.   Among those conditions are that the corporation shall file with the Secretary of State a sworn statement showing "the proportion of the capital stock of said corporation which is represented by its property located and business transacted in the State of Missouri, and such corporation shall be required to pay into the treasury of this State, upon the proportion of its capital stock represented by its property · and business in Missouri, incorporating taxes and fees equal to those required of similar corporations formed within and under the laws of this State."  But that section contains this proviso:  "That the requirements of this article to pay incorporation tax or fee shall not apply to railroad companies which have heretofore built their lines of railway into or through this State."   The relator takes the position that having built its road from St. Louis to Union prior to 1891, it is exempt from the incorporation fee required by that section and is entitled to the certificate or license mentioned therein upon payment of the fee of $1.50 for the issuing of the same. To that the Secretary of State does not agree.

In order to understand the meaning of the clause in the Act of 1891 exempting foreign railroad companies who, under the previous law, had built their roads into or through the State, we may call to our aid the situation of such roads at that date in this State.   It is a fact of common knowledge, of which the court may take cognizance, that in 1891, there were several foreign

railroad companies which had theretofore approached our borders with their roads and, under the express leave of the statute above quoted, had extended their lines into this State, some crossing it from one side to the other, some penetrating it to St. Louis, some to Kansas City, and some to other points. Those roads in 1891 were not in prospect merely, nor was the building of them just begun, but they were accomplished facts, and the respective railroad companies were transacting their business over them. Then when the Legislature came to pass the act requiring foreign corporaions to pay into the State treasury "incorporating taxes and fees equal to those required of similar corporations formed within and under the laws of this State," calculated on a basis of the proportion of their capital stock represented by the business transacted here, it was confronted with the situation above described. Those companies had extended their lines into or through this State on express invitation, and in consideration of that fact the Legislature deemed it but right to exempt them from the tax imposed in that act on other corporations. Besides that, there were other facts which, viewed from a revenue standpoint, justified the Legislature in making a class of such railroad companies and exempting them from that particular tax. Those roads, as we have seen, were accomplished facts. But suppose the Act of 1891 found a railroad in course of construction, suppose the charter called for a road from Fort Scott to St. Louis with meanders or branches covering, as relator's charter does, more than 800 miles in this State, representing according to our law $8,000,000 capital stock, upon which a domestic corporation would have to pay an incorporating tax of $4,-000, and suppose the construction starting at Fort Scott had advanced to and across our State line to a point five miles within this State; did the Legislature intend that the company should be allowed thereafter to construct its 800 miles of road and be exempt from paying the incorporating fee on the theory that it had already built its road into this State? Those companies which

had already built their roads into this State were absolutely exempt from that tax.  But can it be said of a company that it had already built its road when its charter designated particular routes measuring 800 miles, of which it had constructed only five, ten or fifty miles?  Is that what the statute means?  If so, then the part already built must, for all the purposes of that statute, be taken as the whole road.  The company can not, for the purpose of relieving itself of the tax imposed by the statute, say this fifty miles constitutes its road, and then for the purpose of obtaining the license authorized by the statute, say it constitutes only a small part of its road.  If one of the foreign railroad companies owning railroads built prior to 1891, reaching from St. Louis to Kansas City, should now seek to build a new line over a route not before occupied by it, it could do so only on the same terms that a domestic corporation could.  And so a company found with an unfinished road when the Act of 1891 went into effect, if it was entitled to any exemption from the incorporating tax therein required, it was so only to the extent to which it had then built its road into the State, and as to its future building it must stand on a plane with domestic corporations and with other foreign corporations who might now seek to build over new routes.

The Act of 1891 (sec. 1025, R. S. 1899), does not require the foreign corporation to pay the tax on all, but only on "the proportion of its capital stock represented by its property and business in Missouri."  Relator construes this to mean that if it is liable to pay any such tax at all, it is so only on that part of its capital stock represented by its property and business in Missouri, which, it says, is the cost of the construction and equipment of the road from St. Louis to Union, that is, $1,600,000.

The statute requires the foreign corporation to file with the Secretary of State a sworn statement showing the proportion of its capital stock represented by its property and business in this State and the relator has filed a statement showing that amount to be $1,600,000

represented in the road built from St. Louis to Union. The statement is doubtless correct as an estimate on that basis, but that is not the proper basis on which to estimate the proposition of a railroad company's capital stock invested in this State.

Section 1034, Revised Statutes 1899, fixes the minimum of $10,000 a mile as the capital stock for standard-gauge roads, and whilst the capital stock may go over, it can not fall under that sum. The relator's charter shows that its capital stock is $20,000,000 and the total length of its road 900 miles, of which 850 are in this State. Our statute will estimate at least $8,500,-000 of that capital as appertaining to the relator's business in Missouri. In fact, if $1,600,000 is the proportion of relator's capital represented by its business in Missouri, then that sum has all been expended in the construction and equipment of the road from St. Louis to Union, the relator in such case is without any other capital stock available for use in this State, and its whole corporate capacity is absorbed in that fifty or sixty miles of road. The relator must elect to be confined to those limits, or else it must own to a capital stock of at least $10,000 for each mile of standard-gauge road it aspires to in this State.

Railroad corporations are a class in themselves, having peculiar rights and corresponding liabilities, and they are often treated as a class by the lawmaking power. The Act of 1891 covers (with the exceptions mentioned) foreign railroad corporations as well as foreign manufacturing corporations, but when the railroad company comes into the State, having complied with the requirements of that act, it becomes immediately clothed with powers and valuable rights, not possessed by corporations of any other kind. It may invade private property to survey and mark out its lines, make and file maps of its route, and thus mark as for its own lands to be taken by condemnation, the power for which is conferred. In this way when it has surveyed its lines, located its route and filed its maps and profiles, it acquires a right, over any other railroad

company, to condemn that land and build its road along that route. Thus a substantial right accrues to the corporation extending over all its surveyed and located lines in the State. The law does not undertake to put a separate value on that indefinite, inchoate right; it assumes that the railroad company which acquires it will by use of it build its road, and will not listen to the company, while holding that right, to question its own ability or purpose to do so. It will conclusively presume against a railroad company demanding the right to build a standard-gauge road that its capital is not less than $10,000 a mile. This we will take to be the proportion of the capital stock of the relator represented by the business it purposes to transact within this State.

Since, as we have concluded, the building of that part of relator's road which extends from St. Louis to Union is not sufficient to exempt the relator entirely from the tax or fee required by the Act of 1891, and since the cost of that part of the road is not to be taken as the proportion of relator's capital stock employed in this State, it is not absolutely certain that relator is entitled to have any benefit in this suit of that $1,600,000.

But, as before observed, the property and business of a railroad company differ from those of all other corporations, and we must consider that peculiarity in this instance. If a corporation of any other character were found doing business here after the Act of 1891 took effect, without having complied with its terms, it would be subject to the penalties imposed by the act, because it was intended by the lawmakers that such corporations, if they did not care to submit to our terms, were free to cease their operations here and return to their homes. But that intention could not apply to a railroad company then owning and operating fifty or sixty miles of railroad in this State. To forbid such a company to continue to transact its business within the State would be to destroy its property. That our Legislature never intended to do. Whatsoever sum the relator may have expended in further construction since the Act of 1891

went into effect, will be presumed to have been expended with the intention on the relator's part of complying with the law and will be taken as a part of its capital stock employed in this State, upon which the amount of the quasi-incorporating tax or fee will be calculated. That calculation will be made on a basis of $10,000 a mile of road relator's charter calls for, less $1,600,000 expended in the construction and equipment of that part of its road extending from St. Louis to Union.

III.    The point is presented in the demurrer that relator is not entitled to the certificate demanded because its charter gives the right to build and maintain telegraph and telephone lines, which it is said railroad companies under our law do not have.

A foreign corporation admitted to do business in this State, either by comity or by express leave of the statute, can not transact any business which a domestic corporation of like character can not transact, anything in the charter of the foreign corporation to the contrary notwithstanding. In such case if the charter of the foreign company contains a grant of power not allowed by our law, that grant will be treated simply as if it had not been made.

For the reason given in paragraph II of this opinion, the writ of mandamus is denied.

All concur.