OF THE

## STATE OF MISSOURI

AT THE

### OCTOBER TERM, 1902.

*(Continued from Volume 173.)*

## SOUTHERN ILLINOIS & MISSOURI BRIDGE COMPANY, Appellant, v. STONE et al.

In Banc, April 1, 1903.

1. **Right of Eminent Domain:** LIMITATIONS: PRIVATE CORPORATIONS. When the use to which it is proposed to put private property is determined to be a public use, the necessity or expediency of appropriating any such property to that use, is not a subject of judicial inquiry. The right of eminent domain appertains to independent government; it requires no constitutional recognition; it is an attribute of sovereignty; and the constitutional provision requiring just compensation is a limitation only on the exercise of the right, but aside from that limitation the Legislature may appropriate private property to any use which the courts decide to be a public use, or may confer on private corporations the right to exercise that power of appropriation. But before a private corporation, whether foreign or domestic, can exercise the right, it must show that the right has been given it in express terms or by necessary implication.

2. ————: FOREIGN CORPORATION: BRIDGE COMPANY: POWER TO CONDEMN LAND FOR APPROACHES. The articles of incorporation of an Illinois bridge company, licensed to do business in this State, disclose that the object for which it was created a body corporate was "to con-

So. Ill. & Mo. Bridge Co. v. Stone.

struct, maintain and operate a bridge and approaches thereto over the Mississippi river from a point in' Illinois to a point opposite thereto in Missouri, which bridge and approaches shall provide for the passage of railway trains, and at its option for the passage of wagons and vehicles of all kinds, and for the transit of animals and foot passengers." *Held*, that it has, under the law of this State, the right to condemn private property 200 feet wide and 4,500 feet long, on which to lay tracks, to be used as approaches to such bridge.

3. ———: ———: CONSTITUTIONAL INHIBITION. There is nothing in the Missouri Constitution which prohibits the Legislature from conferring on a foreign corporation the right to condemn private property for public use.

4. ———: ———: BRIDGE COMPANIES: POWERS IN THIS STATE. Although a foreign corporation may have the power under the laws of the State of its creation to condemn and appropriate private property to its use, for instance, for approaches and terminals to its toll bridge, it can not exercise that power in this State unless the laws of this State permit it to do so. But although it may have no such power under the laws of the State creating it, that power may be conferred upon it by this State, by a general statute authorizing it to do business in this State, with the right to exercise the same powers and privileges conferred on like corporations organized under the laws of this State.

5. ———: ———: BRIDGE COMPANIES: STATUTES: INCLUDE RAILROAD BRIDGES. The Legislature may lawfully create a franchise to erect a toll bridge and has done so. And the statutes authorizing private companies to incorporate, to construct and maintain "toll bridges" over the streams of this State or "partly in this State" for "a public use," include railroad bridges. And this has been the statutory meaning since the General Statutes of 1865, and the revision of 1879 in using simply the generic term "bridge," instead of enumerating the kinds of bridges that might be constructed, as the statute of 1865 had done, broadened the statute of 1865.

6. ———: ———: ———: CHANGING STATUTE: "ROAD" MEANS "RAILROAD." The changing of a statute authorizing private companies to condemn private lands for bridge purposes, by omitting the words "to the uses of said company" and inserting in their stead the words "for approaches, road, foot or wagon ways of such bridge corporation," did not have the effect to deprive such company, after such amendment, of .the right to acquire lands for necessary approaches and terminal facilities for railroads it was designed to accommodate with passage over its bridge. The word "road" used in the amendment, when the structure is designed for the passage of railroad trains, means "railroad." The words "wagon ways" include all other kinds of roads.

So. Ill. & Mo. Bridge Co. v. Stone.

7. ——: ——: ——: COMPREHENSIVENESS OF A GRANT. Where a statute expressly authorizes a company to erect a bridge it necessarily authorizes the taking of land for abutments.

8. ——: ——: LICENSED IN THIS STATE. A corporation licensed to do business in this State, which has in all things complied with the laws of this State, thereby becomes a domesticated corporation, and has the same rights as a corporation of like character organized under the laws of this State.

.9. ——: ——: ——: BUSINESS HERE. A corporation organized under the laws of another State for the purpose of constructing a bridge across the Mississippi river, which seeks in this State to only condemn land for its approaches, abutments and roadways, can not be said, on the theory that its charter does not authorize it to condemn lands for such purposes, to be endeavoring "to do business in this State other than that expressly authorized by its charter."

10. Statute of Another State: CONSIDERATION. The courts of this' State will not take judicial notice of the legislative acts of other States or of foreign laws. When they are relied upon as affecting the rights of individuals or property they must be introduced in evidence at the trial.

11. Condemnation: BROUGHT AGAINST RECORD OWNERS: SUBSEQUENT ALIENATION. If the condemnation proceeding is brought against the record owners of the land, its subsequent alienation by them to other parties does not render it incumbent on the plaintiff to amend its petition so as to bring them in. Whatever rights the subsequent grantees acquired were taken subject to the condemnation proceedings.

PER VALLIANT, J., DISSENTING; WITH WHOM BRACE, J., CONCURS.

1. Eminent Domain: DELEGATION OF POWER: PUBLIC USE. Eminent domain is the sovereign power over private property. It is in the United States for all necessary purposes of the Federal Government; it is in the State for all other public uses. It can be exercised by no one except by express authority from the sovereign, and then only for a public use. And when a corporation, whether domestic or foreign, claims the right to take private property for its corporate use, it must show, not only that such use is a public use, but also that the legislative power of the State of its creation has conferred such right upon it.

2. Foreign Corporation: POWERS IN THIS STATE. A corporation can not go out of the State of its creation to do business unless its charter permits it, nor, even if so permitted, can it go into another State unless by leave of that State. And though our statute confers on a foreign corporation admitted to do business in this State all the powers possessed by a domestic corporation of like character, this does not mean that such foreign corporation can do in this State that which its charter does not authorize it to do at home.

3. ———: BRIDGE COMPANY: CHARTERED UNDER ILLINOIS STATUTE. A bridge company chartered under a statute of Illinois which limits the purpose of such company to the building and maintaining "a bridge over any of the streams of water, or any part of such streams, situated within the State of Illinois or upon the boundary thereof," is confined to the State of Illinois for the exercise of its charter powers, and such corporation is not within the meaning of our statute which prescribes the terms upon which foreign corporations may come into this State.

4. ———: EMINENT DOMAIN: CONSTRUING STATUTE. A foreign corporation claiming the right of eminent domain in this State is not in a position to demand a liberal construction of the statute under which it is organized. To justify its assumption of the power to condemn private property for its corporate use, it must point to a charter of no doubtful meaning.

5. ———: COMPLIANCE WITH MISSOURI STATUTE: SIMILARITY IN NAME. The mere fact that a foreign corporation is organized as a bridge company, and that it has complied with the Missouri statute in regard to foreign corporations, does not necessarily entitle it to all the powers to which a bridge company organized under the laws of this State is entitled. Similarity in the character of charter powers in such case is essential, and such similarity is not always implied by similarity in name.

6. Eminent Domain: RAILROAD AND BRIDGE COMPANIES. Where a statute permits the organization of railroad bridge companies, but declares that they are not to be held to be railroad companies, such companies can not claim the right of eminent domain which is given to railroad companies.

7. ———: TOLL BRIDGES: INTERSTATE RAILROAD BRIDGE. A corporation organized for the purpose of building an interstate railroad bridge can not claim the right of eminent domain from a statute which relates only to toll bridges to be used for ordinary travel through country roads.

8. ———: COMITY. The right of eminent domain is not conferred by comity, and has never been exercised except by legislative grant in this State.

9. Changing Statute: LEGISLATIVE INTENT. General Statutes 1865, section 16, authorized the organization of companies for the building of bridges, "whether for railroads or ordinary travel, or both;" and section 17 conferred the power on such companies to condemn land. "to the uses of said company." Section 1351, Revised Statutes 1899, which is a substitute for section 16, General Statutes 1865, authorizes the formation of such companies for the building of bridges "for public use, for the crossing of persons or property," and section.

1352, Revised Statutes 1899, which takes the place of section 17, General Statutes 1865, specifies that the land shall be taken only "for approaches, road, foot or wagon ways of such bridge corporation." *Held*, that the Legislature, by these changes in the statutes, intended to eliminate from the provisions of these statutes bridges for railroad purposes.

10. **Railroad Bridges:** CONDEMNING PRIVATE PROPERTY: MISSOURI STATUTES. Section 1351, Revised Statutes 1899, contemplates a bridge "for public use for the crossing of persons or property" in the unrestricted sense of the term, and it is for this purpose that the right to condemn private property is given. A bridge designed for railroad traffic only falls short of this statute, and the power to condemn land (sec. 1352, R. S. 1899) "for approaches, road, foot or wagon ways," does not authorize a foreign bridge company to condemn land 200 feet in width and extending two and a half miles for its "railway tracks, bridges and terminal yards," etc.

Appeal from Dunklin Circuit Court.—*Hon. J. L. Fort, Judge.*

REVERSED AND REMANDED (*with directions*).

*Martin L. Clardy, S. H. West, Wilson Cramer* and *W. H. Miller* for appellant.

(1)   Had plaintiff (appellant) under the facts as they exist in this cause the right to exercise the power of eminent domain in this State? If an affirmative answer be given to this question the case must be reversed. Especially is this true as the trial court based its finding alone on the non-existence of this power. Section 1352, Revised Statutes 1899, confers on domestic bridge companies the right to condemn for bridge purposes. The appellant is not a domestic corporation, but it complied with section 1025, Revised Statutes 1899, and received its license to do business in this State. It can not do business in this State without an approach to its bridge. Section 1024, Revised Statutes 1899, relating to foreign corporations, among other provisions, contains the following: "And such corporation shall be subjected to all the liabilities, restrictions and duties which are or may be imposed upon corporations of like char-

acter organized under the general laws of this State, and shall have no other or greater powers." Appellant contends that by saying "it shall have no other or greater powers," is but another way of saying it shall have the same powers. A domestic bridge company may condemn. The right of eminent domain is one of its powers. When the foreign corporation complies with the Missouri statute it becomes, *ipso facto,* a domestic corporation, and its powers are only restricted by the term "no greater," etc. If, on this proposition, authorities other than the statute are wanted, fortunately they are readily found. The language hereinbefore quoted from the Missouri statute is a literal copy of the Illinois statute on the same subject, and presumably the construction placed on this statute by the Illinois Supreme Court will be of controlling weight in Missouri in the absence of a different construction by our own court. Sec. 26, Illinois Corporation Act, adopted in 1872; Female Academy v. Sullivan, 116 Ill. 375; Farmers' Loan & Trust Co. v. Railroad, 173 Ill. 439; Barnes v. Suddard, 117 Ill. 237; Stevens v. Pratt, 101 Ill. 217. This court, in Gray v. Railroad, 81 Mo. 126, and in Railroad v. Lewright, 113 Mo. 660, held that, under section 1060, Revised Statutes 1899, relating to foreign corporations, foreign railroad corporations had the right to condemn land for right of way in this State. Bridge Company v. Ring, 58 Mo. 494; and Bridge Company v. Schaubacker, 49 Mo. 555, are at least two cases in Missouri where the right to condemn for approaches to bridges across the Mississippi river was distinctly recognized. It does not appear from the decisions whether these bridge companies were domestic or foreign corporations. The act of Congress, under authority of which this appellant is acting, distinctly declares it to be a "public highway," etc., and "shall be recognized and known as a post route," etc. In Leasee v. Railroad, 72 Mo. 561, this court says: "The right of eminent domain may be exercised by any artificial person clothed with a franchise, the enjoyment of

which promotes a public use," etc.   In the light of the foregoing authorities the conclusion is irresistible that this appellant has the same power that it would have had had it been incorporated under the laws of the State of Missouri, and therefore has the right to condemn real estate for its approach.   (2) It is conceded that defendants were the record owners of the property sought to be condemned at the time of filing the petition.   This was sufficient.   Sec. 1264, R. S. 1899; Chatner v. Railroad, 122 Mo. 387.   (3) Whether properly or improperly, it is made to appear in this case that there is a rival corporation after the identical land for the purpose of building the approach to appellant's bridge. This rival company was incorporated April 24, 1902. The land in question had been surveyed and this approach located on it in February and March, and in the language of one of the conspirators, Louis B. Houck, was bristling with stakes, numbers, etc.   In this condition of affairs priority in time gives priority in right. Lewis on Eminent Domain, sec. 306; Railroad v. Blair, 9 N. J. Eq. 635; Railroad v. Railroad, 105 Pa. 13; Davis v. Railroad, 114 Pa. 308; Railroad v. Alling, 99 U. S. 463; Railroad v. Railroad, 44 Hun  206; Railroad v. Railroad, 110 N. Y. 128; 17 N. E. 680; Railroad v. Railroad, 159 Pa. 331, 28 Atl. 155; Railroad v. Railroad, 61 Vt. 1; 17 Atl. 923; Railroad v. Railroad, 43 W. Va. 119; 30 S. E. 86.   (4) The right of appeal seems to be our only remedy.   Railroad v. Neville, 110 Mo. 349; State ex rel. v. Shelton, 154 Mo. 691.

*Giboney Houck, John A. Hope* and *M. R. Smith* for respondents.

(1)   The statute requires the owner to be sued in condemnation cases.   R. S. 1899, sec. 1264.   (a) The word "owner" as used in the statute must mean any one who holds the property in a bona fide way and is entitled to the use thereto or enjoyment of whatever it may produce in the way of rents and profits.   It does not

mean a technical legal right to hold, or, more correctly speaking, it embraces the actual equitable right and title to the property. In Owen v. Railroad, 12 Wash. 318, the court said: "The appellant had actual notice of the title and claim of the respondents, and that being the case, appellant can not rely upon the lack of constructive notice provided by statute." Lewis on Eminent Domain, p. 784, note; Bouvier's Law Dictionary, title, "Owner;" Wilder v. Harghey, 21 Minn. 101; Smith v. Ferris, 13 N. Y. 553. (b) The law is well settled in Missouri that if a party purchase land of another with knowledge of an unrecorded deed outstanding to a third party made by the one from whom he purchases, he takes with full notice of that deed, and necessarily acquires no title. Fox v. Hall, 74 Mo. 315. (c) From the testimony of Koslowsky and the evidence offered by defendants, it must be conceded that plaintiff company had knowledge of the option held by Crowder. This knowledge was notice, and the bringing of the suit to condemn against the defendants only, and without joining Crowder, was not in good faith, and not within the true interpretation of the statute. Vance v. Corrigan, 78 Mo. 94; Payne v. Lett, 90 Mo. 676; Nolan v. Taylor, 131 Mo. 224; Schleff v. Imp. Co., 57 N. H. 110; Pinkerton v. Railroad, 109 Mass. 527; Fulton Co. v. Amorans, 89 Ga. 614. (2) Although the appellant bridge company may have in Illinois, the State of its creation, the power to condemn property for its bridge and approaches, yet, it has no such power in this State unless conferred upon it by some law of the State. President v. Trenton Bridge Co., 13 N. J. Eq. 50; Clark & Marshall on Private Corp., sec. 854, p. 2734; Attorney-General v. Railroad, 27 N. J. Eq. 647; Railroad v. Mutchler, 42 N. J. L. 461; 4 Am. and Eng. Ency. Law (2 Ed.), p. 930, par. 3 and notes; Middle Bridge Corp. v. Marks, 26 Me. 326; Luxton v. North River Bridge, 153 U. S. 530; State v. Railroad, 25 Ver. 441; Crosby v. Hanover, 36 N. H. 422; Saunders v. Bluefield Waterworks Co.,

58 Fed. 138; 1 Lewis on Em. Dom., 588; 13 Am. and Eng. Ency. Law (2 Ed.), p. 858, par. 7; Railroad v. Young, 33 Pa. St. 180. (3) Respondents say that appellant, under the pleadings and proof, has no power to condemn property in this State for any purpose, not even for its bridge and approaches. Bridge Co. v. Kentucky, 154 U. S. 219; Const., art. 12, sec. 14; R. S. 1899, sec.1127. Foreign railway companies and foreign bridge companies do not stand on the same plane in Missouri. R. S. 1899, sec. 1060; Mills on Em. Dom., sec. 48; 1 Lewis on Em. Dom., secs. 237, 238 and 240; Bridge & Tramway Co. v. McLane, 8 Tex. Civ. App. 665. The courts of Missouri will not take judicial notice of the laws of Illinois or that the taking of property for bridge purposes is for public use, and whether the statute under which appellant bridge company was incorporated conferred upon it the power of eminent domain was a question that should have been pleaded and proved, and not having been done, the court will assume that the common law was in force in that State. Meyer v. McCabe, 73 Mo. 236; Portsmouth Livery Co. v. Watson, 10 Mass. 92. (4) Manifestly appellant bridge company has no power to condemn "a right of way for its railroad tracks . . . and terminal yards," etc., using the language of appellant's petition. Laws of Illinois, 1872, pp. 551 and 552; R. S. Illinois, 1896; R. S. 1899, sec. 1024; Const. (Mo.), art. 12, sec. 7; Railroad v. Gebhart, 109 U. S. 537; Diamond Match Co. v. Powers, 51 Mich. 145. (5) The certificate from the Secretary of State of Missouri, issued to appellant company, could only, and was but intended to, constitute a license to do business for a certain period of time. This license merely conferred on it all the rights and privileges granted foreign corporations under the laws of Missouri. 6 Com. on Law of Corp. (Thompson), secs. 7890, 7891 and 7896. (6) It is conceded by respondents that the appellant corporation, by virtue of the certificate issued to it by the Secretary of State of the State of Missouri, secured the

privilege of doing business in Missouri, or the right to exercise such franchises as was conferred upon it by the laws of Illinois (except that of the right of eminent domain), which authorized it to transact its ordinary business. But it is denied that by such license it was vested with power to condemn property or regulate tolls and tariffs. R. S. 1899, sec. 1264; Holbert v. Railroad, 45 Iowa 27; 3 Clark & Marshall on Priv. Corp., p. 2734, sec. 854; 1 Lewis on Em. Dom. (2 Ed.), p. 574, sec. 243; Lyon v. Jerome, 26 Wend. 499; Railroad v. Railroad. 111 Mass. 131; State v. Railroad, 25 Vt. 442; 6 Thompson on Priv. Corp., p. 6310, sec. 7932. (7) Respondents maintain that all the authority and privilege that the certificate from the Secretary of State can confer on a foreign railroad company to do business in the State, is the right and privilege to transact the ordinary business of a railroad company, such as soliciting freight and passengers for its road and making contracts generally with respect to the general transportation business done by a railroad company. And the same rule would apply to a foreign bridge company, conceding that it had by its charter and the law under which it was authorized, the power to condemn property. Steam Heating Co. v. Gas Fixtures, 60 Mo. App. 115; Carson-Rand Co. v. Stern, 129 Mo. 389; 6 Com. on Law of Corp. (Thompson), secs. 7890, 7891, 7892, 7893 and 7896; Sullivan v. Sheehan, 89 Fed. 247. (8) Respondent contends that while section 1060 authorizes railroad companies of adjoining States to extend their lines from such States into and across this State, and confers upon such companies all the rights, powers and privileges conferred by the general laws of this State upon railroad corporations organized thereunder, yet, that statute was not intended in any way to affect foreign bridge companies, and it does not give them power to condemn property on which to build a railroad and terminal yards or to condemn for bridge approaches. R. S. 1899, sec. 1060; State ex rel. v. Seay, 23 Mo. App.

630; Gray v. Railroad, 81 Mo. 136; Railroad v. Lewright, 113 Mo. 668.   (9) Neither the Constitution nor laws of the State of Missouri, by implication or otherwise, confer upon foreign corporations which, by their charters, have the power to condemn property, the power when licensed to do business in this State to condemn property; but, on the contrary, the statute regulating the condemnation of property by railroad, telegraph and telephone companies confers that power only upon such companies as are organized under the laws of this State.   R. S. 1899, sec. 1264; Sutherland on Stat. Construction, p. 495, sec. 387; Cooley on Const. Lim. (6 Ed.), pp. 648-651 and 665; Lyon v. Jerome, 26 Wend. 499; 1 Lewis on Em. Dom. (2 Ed.), p. 574, sec. 243; Butler v. Morgan, 74 Ga. 575.   (10) The plaintiff company, being a foreign corporation, could not, without showing positively its power to condemn property, exercise this right in the State of its own creation; much less could it exercise this power in a foreign State, upon a license to do business, from the Secretary of such foreign State. 2 Tiedeman on Police Reg., p. 985; Sullivan v. Sheehan, supra. (11) The Cape Girardeau & Thebes Bridge Terminal Railroad Company made its survey, permanently locating its line of road to the proposed bridge of plaintiff company, and filed its profile and map of such located survey as provided by section 1056, prior to appellant's filing any map or profile of its survey.   In re Rochester v. Railroad, 110 N. Y. 128; 3 Elliott on Railroads, sec. 927; Railroad v. Blair, 9 N. J. Eq. 635; 2 Lewis on Em. Dom., sec. 306; Railroad v. Pittsburg, 105 Pa. St. 13; Railroad v. Railroad, 60 Fed. 981; Railroad v. Railroad, 141 Pa. St. 407.   (12) Section 1024 was passed by the Legislature in the exercise of its police powers for the public good, and not to confer on some foreign corporation (i. e., a foreign bridge corporation) the right to condemn property.   2 Tiedeman on Police Powers, p. 983, sec. 213, and note 1; 4 Thompson on Priv. Corp., secs. 5470 and 5471; Atty.-

Genl. v. Ins. Co., 6 Am. Railroad & Corp. Rep. 655, note 1; Hollinsworth v. Parish of Tensas, 17 Fed. 114; 22 Am. and Eng. Ency. Law (2 Ed.), 916; Talbot v. Hudson, 1 Thayer's Cases Const. Law 1017; Paul v. Virginia, 8 Wall. (U. S.) 168; Daggs v. Ins. Co., 136 Mo. 391; State v. Stone, 118 Mo. 401; List v. Com., 118 Pa. St. 327; Murfee on Foreign Corp., p. 98, sec. 119. (13) The approaches to a bridge within reasonable limits constitute part of the bridge, but by no kind of construction could the strip two hundred feet in width, commencing at the east end thereof at the point where the road strikes the bluffs or land elevation, and thence westwardly to the terminus of the Cotton Belt Railway, a distance of two and one-half miles, constitute the approach, or part thereof, to such bridge. Rush Co. v. Gravel Road Co., 87 Ind. 505; Whitcher v. Summerville, 138 Mass. 455; Nims v. Boone Co., 66 Ia. 272; Moreland v. County, 40 Ia. 394; Tollard v. Woodington, 26 Conn. 578; Commissioners v. Deerfield, 6 Allen (Mass.) 449. (a) An approach is not a bridge as a matter of law, and that the word "bridge" includes approaches, must depend upon the intention with which, in view of all the circumstances, the word is used. Nims v. Boone County, supra. (b) What constitutes a bridge, which includes the approaches thereof in a particular case, is a question of fact rather than of law. Tollard v. Woodington, supra. Approaches are not always regarded as part of the bridge unless the charter expressly so defines, and if not so defined by the charter, then the approach, regarded as part of the bridge, must be determined by what is reasonable, under the particular circumstances of each case. Commissioners v. Deerfield, supra.

GANTT, J.—This is an appeal from a judgment of the circuit court of Dunklin county dismissing the petition of the plaintiff, in which it prayed for the appointment of commissioners to assess the damages which

would be sustained by its appropriation of certain land lying on the west bank of the Mississippi river, in Scott county, in this State, for approaches, roadway and terminal yards. The amount of land which it sought to condemn for its use as a bridge company was about twenty acres, a strip two hundred feet wide and about 4,500 feet long, and extending west from the bank of the river. The defendants were the record owners when the petition was filed. The application in the first instance was made to Judge Riley, the regular judge of the Scott circuit. An affidavit of prejudice was filed against him and he thereupon granted a change of venue to Judge Fort's circuit, and sent the case to Dunklin county.

The petition is as follows:

"In the Circuit Court of Scott County, Missouri, to October Term, 1902.

"Southern Illinois & Missouri Bridge Company, Plaintiff,

  . v.

Robert Stone, R. M. Finley, Nannie E. Finley, David Heldt, Burhardt Miller and Perry Bates, Defendants.

"Plaintiff for its cause of action says it is a corporation regularly incorporated under the laws of the State of Illinois, and has obtained from the Secretary of State of the State of Missouri authority to do business in the State of Missouri. That it is incorporated for the purpose of erecting and maintaining a bridge across the Missisippi river from a point near Thebes, in Alexander county, Illinois, to a point near Manning's Landing, in Scott county, Missouri, with the necessary appurtenances thereto. That said bridge is intended as a railway bridge and it is necessary for this plaintiff to have a right of way for its railway tracks, bridge and terminal yards, etc. That the general direction of its yards will be westwardly from the western bank of the Mississippi river. That for the purpose of carrying

out its charter privileges it is necessary for it to hold
and to own the following described tract of land, lying
and being in the county of Scott, State of Missouri, to-
wit:   A part of the southeast and southwest parts of
private survey No. 794 in township 30, range 14 east
and inlot 2 of the northeast quarter of section 2, town-
ship 29, range 14 east, being a tract of land two hundred
feet wide, one hundred feet on each side of the center
line of the approaches to the Southern Missouri & Illi-
nois Bridge Company, as located and platted, beginning
at a point on the east line of fractional section 24, town-
ship 30, range 14 east and 1,240 feet from the southeast
corner of said fractional section, thence run south 70
degrees 45 minutes east 765 feet, thence by a one degree
curve to the right 980.4 feet, thence south 59 degrees
45 minutes east 924.8 feet, thence by a two degree and
30 minute curve to the left 1,289.3 feet, thence north 87
degrees 51 minutes east to the west bank of the Missis-
sippi river; said center line intersects the north line of
township 29, 100.5 feet west of the northwest corner of
lot 2 in the northeast quarter of section 2, township 29,
range 14 east, and also intersects the west line of said lot
2, 69.1 feet south of the northwest corner of said lot
2.    The tracts above described contains 20.3 acres, and
will appear by a blue print hereto attached and made a
part of this petition.

"That the defendants herein, together with R. M.
Finley, the husband of one of the defendants, are the
owners of said real estate.   That defendants Heldt, Mil-
ler and Bates are tenants, having growing crops on
different portions of said real estate.   That the defend-
ants have refused to relinquish to the plaintiff the right
to the occupancy and use of said real estate for the pur-
poses designated.   That your petitioner has endeavored
to agree with defendants and each of them, upon the
price to be paid for said property, but has been unable
to amicably settle or to agree at all upon a proper com-
pensation to either of the parties defendant.   That said

real estate is necessary for the laying of tracks and the handling of business over and across plaintiff's bridge.

"Wherefore your petitioner prays the court to make such order and decrees that may be proper and necessary and to appoint three freeholders of the county of Scott and State of Missouri as commissioners to assess the damages which defendants may sustain in consequence of the establishment, erection and maintenance of said road and approaches over and through the said premises and for all proper orders."

Summons regularly issued and was served on defendants. When the cause reached Dunklin county, the defendants filed the following pleading which they denominate an answer, in the caption, and a motion, in the body.

"In the Circuit Court of Dunklin County, Missouri. Southern Illinois & Missouri Bridge Company, Plaintiff.

v.

R. G. Stone, R. M. Finley et al., Defendants.

### ANSWER.

"Defendants in the above entitled cause, Robert G. Stone, R. M. Finley, and Nannie Finley, limit their appearance herein for the sole and only purpose of this motion, and make the following suggestions and objections against the appointment of commissioners as prayed for in plaintiff's pretended petition:

"First. No summons or notice has ever been issued and served upon these defendants in the manner required by law. The pretended summons or notice purports to have been issued by the clerk of the court, and it does not appear that prior thereto the said court or the judge thereof had ordered plaintiff's petition to be filed, nor that the court or the judge thereof ordered any summons or notice issued upon said pretended petition. It appears upon the face of said pretended petition and of said pretended notice or summons that said

petition was never ordered filed and said pretended notice or summons never ordered issued by the court or judge, and that said pretended petition was received and said pretended notice made out without authority from the court and contrary to law.

"Second. It appears from the face of the plaintiff's pretended petition that the plaintiff is a corporation incorporated under the laws of the State of Illinois for the purpose of constructing and maintaining and operating a bridge across the Mississippi river, and these defendants say such a corporation, incorporated under the laws of another State, for such a purpose, has no right, power, or authority, under the Constitution and laws of Missouri, to condemn property of any kind, situated in the State of Missouri, for any use, public or private.

"Third. It does not appear by said pretended petition that plaintiff has received any authority from the Congress of the United States to erect a bridge across the Mississippi river.

"Fourth. It does not appear by said pretended petition that plaintiff has any right or authority to do business in the State of Missouri, there being no allegations anywhere in said pretended petition showing compliance by it with sections 1014, 1015, 1016, 1017, 1024, 1025, 1026 and 1027, article 1, chapter 12 of the Revised Statutes of Missouri of 1899.

"Fifth. It does not appear by said pretended petition that plaintiff has surveyed or located the ground over and upon which it pretends to have the right to build railway tracks, bridge, and terminal yards, nor does it appear by said pretended petition that it has filed in the office of the clerk of the county court of Scott county any profile or map of any such survey or location.

"Sixth. The plaintiff has no right, power, or.auity under the law to condemn a strip of land two hun-

So. Ill. & Mo. Bridge Co. v. Stone.

dred feet wide for a right of way for railroad purposes, or for any other purpose.

"Seventh. These defendants further state that prior to the time of the issuance of the pretended notice or summons herein, and that prior to the delivery of the said pretended petition to the clerk of the circuit court of Scott county, Missouri, they had sold, conveyed and transferred the land described in said pretended petition in good faith and for a valuable consideration to J. H. Crowder, L. B. Houck and Giboney Houck, by deed duly signed, executed, acknowledged and delivered and recorded in the office of the recorder of deeds of said Scott county. Defendants further state that prior to the beginning and prior to the pretended institution of this suit in the circuit court of said Scott county the aforesaid deed had been duly filed for record in the office of the recorder of deeds of said Scott county. Defendants further state that long prior to the execution of the aforesaid deed they had entered into a contract with the said grantees in said deed for the sale and conveyance of said real estate to said grantees and that said deed was executed and delivered in pursuance of said contract for the sale of said land; and that the plaintiff herein had notice and knowledge, long prior to the execution of said deed, and long prior to the pretended beginning of this suit, of the existence of said contract of sale, and of the fact that these defendants had sold said property to the said grantees in said deed. So the defendants say that at the time of the pretended beginning of this suit they were not the owners of said property and had no title thereto, and did appear upon the record in the recorder's office of said county as owners thereof or as having title thereto, but on the contrary the plaintiff herein had constructive notice of said sale and conveyance by the record thereof in said recorder's office as well as actual notice and knowledge of said sale and conveyance.

Vol 174 mo—2.

"Eighth. Defendants further state that prior to the beginning of this pretended suit, and prior to the delivery of the plaintiff's pretended petition to the clerk of said Scott Circuit Court and prior to the issuance of the pretended notice or summons herein and prior to the pretended service of the said pretended notice or summons on these defendants, the Cape Girardeau & Thebes Bridge Terminal Railroad Company, a corporation organized under the laws of the State of Missouri, for the purpose of constructing and maintaining a railroad in Scott county, Missouri, from Frensdorf Station on Houck's Missouri & Arkansas railroad to the Mississippi river, had bought and had acquired and had appropriated to the public use and for the purpose for which it was incorporated, the property described in the said pretended petition.

"Ninth. Defendants further state that the plaintiff, which is a corporation under the laws of the State of Illinois, had no right to construct and operate a railroad, nor to engage in the railroad business, in the State of Missouri, because such business is not expressly authorized in its charter or by any law of this State under which said corporation may come; and this proceeding by it to condemn property for the building of a railroad and its engaging in the railroad business in this State violates the plain provisions of section 1024 of the Revised Statutes of Missouri of 1899, and section 7 of article 12 of the Constitution of Missouri.

"Tenth. These defendants further state that the appropriation by the plaintiff of any part of the real estate mentioned in plaintiff's pretended petition by the plaintiff herein, to any extent whatever, would not only interfere with the use of the same by the Cape Girardeau & Thebes Bridge Terminal Railroad Company for the purpose for which it has acquired and appropriated the same, but would utterly ruin and confiscate the same as the property of said Cape Girardeau & Thebes Bridge Terminal Railroad Company; and even

if the plaintiff has a right to condemn, which these defendants deny, the condemnation attempted by the plaintiff in this proceeding would and does violate the fifth subdivision of section 1075 and section 1272 of the Revised Statutes of Missouri of 1899.

"Eleventh. Defendants further show and state to the court that there is now, and has been since May 2, 1902, pending in the said circuit court of Scott county, Missouri, a suit wherein the Cape Girardeau & Thebes Bridge Terminal Railroad Company is plaintiff, and the Southern Illinois & Missouri Bridge Company is defendant, the object of which suit is to permanently restrain and enjoin the plaintiffs herein from in any way interfering with said property, and from doing anything in or about said property tending to disturb the said Cape Girardeau & Thebes Bridge Terminal Railroad in its sole and exclusive possession and use of said property; and that a temporary injunction of the said Scott Circuit Court issued in said cause, is now and has been since May 3, 1902, in full force and effect, and by said temporary injunction plaintiff herein, its agents and employees and all who may act in aid of them or either of them, were and are now enjoined and restrained from interfering in any way with said Cape Girardeau & Thebes Bridge Terminal Railroad Company in its exclusive use, occupancy, and possession of said property, and particularly enjoined and restrained from prosecuting the very suit in which this motion is filed, and from taking any possession and from doing anything under or by virtue of any order or proceeding in this suit to disturb said Cape Girardeau & Thebes Bridge Terminal Railroad Company, in its said exclusive use, occupancy and possession of said property; and that permitting plaintiff to further prosecute this suit or making any further order or judgment for them or in their behalf in this cause would be contrary to the terms of said injunction, contrary to the law, and would be giving sanction to violations of writs lawfully issued by

the courts of the State and a countenancing of acts in violation of law and in contempt of the lawful writs and orders of the courts.

"Wherefore defendants pray that plaintiff's petition be dismissed and that all orders, steps, and proceedings heretofore had or done in this cause be quashed and for naught held, and for all other proper relief."

The cause came on for hearing, and the learned circuit court, as above stated, dismissed the case for the reason that the plaintiff bridge company did not have the right to condemn land in this State for its approaches and necessary terminal facilities to accomodate the railroad for which it proposed to furnish a bridge over the Mississippi river from Grays Point to Thebes, Illinois. This judgment we are asked to reverse.

On the hearing the plaintiff introduced and read in evidence an act of Congress, approved January 25, 1901, entitled, "An Act to authorize the construction of a bridge across the Mississippi river at or near Grays Point, Missouri."

The first section thereof is as follows:

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Southern Illinois and Missouri Bridge Company, a corporation created and organized under and by virtue of the laws of the State of Illinois, its successors and assigns, be, and the same are hereby authorized and empowered to erect, construct, maintain, and operate a bridge and approaches thereto over the Mississippi river from a point on the Mississippi river in Alexander county, in the State of Illinois, opposite the terminus of the Saint Louis Southwestern Railway, at or near Grays Point, in Scott county, in the State of Missouri, or from some other convenient point on said river in said Alexander county, Illinois, to some opposite point on said river in the State of Missouri, within the distance of three miles above or below the terminus

of said railway. Said bridge shall be constructed to provide for the passage of railway trains, and, at the option of said corporation, its successors or assigns, may be so constructed as to provide for and be used for the passage of wagons and vehicles of all kinds, for the transit of animals, and for foot passengers, for such reasonable tolls as may be approved from time to time by the Secretary of War." [U. S. Stat. at Large, 1899-1901, ch. 181, p. 741.]

Plaintiff also introduced in evidence its charter, of date December 28, 1900, certified by the Secretary of State of Illinois, whereby it appears that said plaintiff is a legally authorized corporation under the laws of Illinois under and in pursuance of an act of the Legislature of that State, entitled, "An Act concerning Corporations," approved April 18, 1872, and "all acts amendatory thereof."

Section 2 of its articles of incorporation is in these words:

"The object for which said corporation is formed is to erect, construct, maintain, and operate a bridge and approaches thereto over the Mississippi river, from a point on the east bank of the Mississippi river, in the county of Alexander, in the State of Illinois, to a point opposite thereto in the State of Missouri, which said bridge and approaches thereto, shall provide for the passage of railway trains, and, at the option of said corporation, its successors and assigns, may be so constructed as to provide for and be used also for the passage of wagons, and vehicles of all kinds, for the transit of animals, and for foot passengers, for such reasonable tolls as may be approved from time to time by the Secretary of War."

The plaintiff also read in evidence the following certificate by the Secretary of State of Missouri:

"Whereas, the Southern Illinois and Missouri Bridge Company, incorporated under the laws of the State of Illinois, has filed in the office of the Secretary

of State, duly authenticated evidence of its incorporation, as provided by law, and has, in all respects, complied with the requirements of law governing foreign private corporations.

"Now, therefore, I, Samuel B. Cook, Secretary of State of the State of Missouri, in virtue and by authority of law, do hereby certify that said Southern Illinois and Missouri Bridge Company is from the date hereof duly authorized and licensed to do business in the State of Missouri for a term ending December 28, 1950, and is entitled to all the rights and privileges granted to foreign corporations under the laws of this State, and that the amount of the capital stock of said corporation is fifty thousand dollars, and the amount of said capital stock represented in the State of Missouri is twenty-five thousand dollars.

"In testimony whereof," etc.

The foregoing certificates and their legal effect must furnish the basis of our opinion.

The right of eminent domain appertains to every independent government. It requires no constitutional recognition; it is an attribute of sovereignty. The provision found in the Constitutions of our various States providing for just compensation for private property taken or damaged for public use is a limitation only upon the exercise of the right.

When the use is determined to be a public one, the necessity or expediency of appropriating any particular property is not a subject of judicial inquiry. The property may be appropriated by the Legislature, or, as in Missouri, the power of appropriating it may be conferred upon private corporations to be exercised by them in the execution of works in which the public is interested. Property taken for toll bridges and ferries, is for a public use. They are public highways. [Arnold v. Bridge Co., 1 Duvall (Ky.) 372; Young v. Buckingham, 5 Ohio 485; Plecker v. Rhodes, 30 Gratt. 795; State v. Maine, 27 Conn. 641, 646.]

These general principles are not questioned, but the insistence is that the plaintiff bridge company being a foreign corporation has no power to condemn lands in this State for its approaches and terminal grounds to accommodate the several railroads converging at Grays Point.

It is unquestionably true that when a private corporation, whether foreign or domestic, asserts the right to exercise the power of eminent domain, it must show that the right has been given it in express terms or by necessary implication.

The articles of incorporation and the certificate of the corporate existence of the plaintiff disclose that the object for which it was created a body corporate was, to construct, maintain and operate a bridge and approaches thereto over the Mississippi river from a point in Alexander county, Illinois, to a point opposite thereto in this State, which bridge and its approaches shall provide for the passage of railway trains, and at its option for the passage of wagons and vehicles of all kinds and for the transit of animals and foot passengers.

That the Legislature may lawfully create the franchise of erecting a toll bridge we have no doubt whatever.

It is as much an object of public concern as a turnpike road, or a railroad or other public highway—and a necessary incident to such a structure is the right to provide proper and suitable approaches and to lay rails thereon to adapt it to the purpose for which it is to be built. But at the threshold of this discussion we are met with the assertion that this is a foreign corporation and that for two reasons it can not exercise the high prerogative power of eminent domain.

Now it is abundantly established in this court that there is nothing in our Constitution which prohibits the Legislature of this State from conferring upon a foreign corporation the right to condemn private property

for a public use.    [Gray v. Railroad, 81 Mo. 126; Railroad v. Lewright, 113 Mo. 660; State ex rel. Railroad v. Cook, 171 Mo. 348.] And such is the rule of decisions elsewhere.    [In re Townsend, 39 N. Y. 171.]

In Lewright's case, supra, it was said that it was evidently the intention of our Legislature to encourage foreign railroad corporations to extend their roads into and through this State and to place them upon an equal footing and confer on them the same rights that are conferred on domestic corporations of like character, and to the same effect is State ex rel. Railroad v. Cook, supra.

This fundamental proposition we do not understand to be denied by defendants.    Their contention is that the plaintiff bridge company being a foreign corporation can have, first, no greater or other powers than is conferred upon it by the laws of Illinois, the State of its creation; secondly, that whether it has the power to condemn approaches and terminal facilities by the laws of Illinois or not, it can not exercise these powers in this State unless our own laws permit it.

That this second proposition is true we have no doubt whatever.    The proposition, then, which first forces itself upon our attention is, conceding that the State of Missouri may constitutionally confer the power upon the plaintiff, the right to condemn and appropriate lands for its approaches and roadways, has it done so?

Without extending our inquiries to an earlier period we find that in the General Statutes of Missouri of 1865, sections 16, 17 and 18 of chapter 69, pages 370 and 371, authority was given for the formation of bridge companies for the purpose of constructing and maintaining bridges over streams of water or any part of such streams which may be within this State for public use for the crossing of persons or property. Among the objects required to be stated in the articles of incorporation was "the purposes for which such

bridge is to be used, whether for railroads or ordinary travel, or both." By section 17 express power was given to appropriate lands belonging to private persons upon proper compensation to be paid and ascertained as provided in chapter 73 of that revision. By section 18 power was given such bridge company to consolidate its franchises and property with that of any bridge company within this State *or any other* to be connected by said bridge. At that date it will be noted the act required the articles of incorporation to specify the kind of bridge, and bridge companies were authorized to build railroad bridges.

In 1872 section 17 of said chapter was amended by inserting after the words "necessary to appropriate any lands of private persons or corporations," the words "for approaches, road, foot or wagon ways of said bridge company," and provided that the condemnation proceedings should be conducted as provided in chapter 66 of General Statutes of 1865 instead of chapter 73, as provided in the original section. Thus the statute remained until the revision of 1879, when sections 16, 17 and 18 were amended and appear in that revision as sections 953, 954 and 955.

As amended section 953 authorized the formation of bridge companies "for the purpose of constructing and maintaining bridges over any of the streams of water, or any part of such streams, which may be within this State, for public use, for the crossing of persons or property," and then instead of specifying what the articles of incorporation should contain, it adds the comprehensive words, "according to the provisions of this article." Those provisions were found in sections 926, 927, 928, 929 and 930. In the third subsection of section 929, corporations were authorized to be formed (in addition to the special provisions of 953) for the purpose of "constructing toll bridges."

These sections remained unchanged in the revision of 1889 save that they were numbered 2803, 2804 and

2805, and are found in the same terms in the revision of 1899, but numbered 1351, 1352 and 1353. So that for fifty years at least our laws have invited and encouraged the incorporation of bridge companies to construct bridges over the streams of water in this State, or partly therein, and under their authority bridges have been constructed over the Mississippi river. [Bridge Co. v. Ring, 58 Mo. 491; Bridge Co. v. Schaubacker, 49 Mo. 555.]

In the construction of these statutes and the various revisions it is insisted that the change made in 1879 by omitting from section 16 as it appeared in 1865 the provisions as to what the articles should contain and particularly the words *"whether for railroad or ordinary travel, or both,"* indicated a purpose on the part of the General Assembly to deny the right of incorporation of a company to construct and maintain a *railroad* bridge. In a word, the argument is that because the Legislature in revising chapter 69 of General Statutes of 1865, saw fit to prescribe certain general provisions as the form of the articles of incorporation and remitted the incorporators to the general provisions of the articles, in which they are found, in framing their articles of incorporation, instead of repeating them again in section 16 as originally enacted, it is contended that the general power to form companies to build "toll bridges" "for public use," over any of the streams of this State, excludes *"railroad toll bridges."* We are compelled to reject this interpretation of our statutes as too narrow and unwarranted by the history of this statute.

It will be observed that the power given in section 16 in the General Statutes of 1865 was to construct and maintain a bridge *for public use.*

The grant is general. There was no purpose or intention of enumerating the particular kinds of bridges that might be built, further than it should be for public use. The only reference to railroad bridges is found

in the direction as to the form of the articles and there the incorporators are required to designate the kind of toll bridge they propose to build; if "a railroad bridge," it must have been so designated in the articles; if for "ordinary travel," "so specify;" if for both, it must be stated in the articles; but nowhere in the statute is there to be found any restrictive words, further than the structure must be for public use. Now when amended in 1879, the same unlimited power of selection of the kind of the bridge to be constructed was left to the incorporators, and they are referred for the form of their articles to the general provisions of the chapter. But if we could bring ourselves to the view that the General Statutes of 1865 undertook to name the kind of bridge companies that might be incorporated and that the subsequent revision of 1879, instead of enumerating, used the generic term "bridge," we would unhesitatingly say that instead of *restricting* the power the Legislature had evidently intended to *enlarge* it. The power is given to incorporate, to construct and maintain "toll bridges."

The argument that by omitting the words "whether for railroads" in the articles of incorporation, the Legislature intended to repeal the power to incorporate a company to construct a railroad toll bridge, would apply with equal force to the associated words "ordinary travel" and thus the statute would prove itself a "*felo de se*" and utterly nugatory, a construction repugnant to all correct and accepted rules of construction. Our conclusion is that a railroad bridge is a bridge for public use within the meaning of section 1351, Revised Statutes 1899.

But it is further contended that the changing of the words in section 17 of the General Statutes 1865, "to the uses of said company," to a power of condemnation of private property "for approaches, road, foot or wagon ways of such bridge corporation" had the effect of depriving said companies after the said amendment of the

right to acquire grounds for the railroads it was designed to accommodate over its bridge, and because railroad companies are by the act authorized to build their own bridges (sec. 1035, R. S. 1899), it is assumed that the right of bridge companies to build one bridge which may accommodate a large number of railroads converging at the point of its construction and to condemn land for its approaches and for the necessary switch yards and terminal facilities to enable it to serve all of its patrons, is taken away. We are not inclined to give a statute, designed, as we think this was, to facilitate the commerce of Missouri with her sister states, any such restricted construction.

The building of the Eads bridge at St. Louis, and the Hannibal and St. Joseph bridge at Kansas City, and other like structures, have contributed in a marvelous degree to the upbuilding of our great metropolitan cities and have proven of inestimable value to our own citizens. Each of these bridges has afforded accommodations and a means of entrance and exit for a large number of railroads. The Legislature deemed the acquisition of approaches, roads and wagon ways necessary incidents of such structures. "Roads" as used in this statute, when the structure is designed for the passage of railroad trains, means *railroads*, because if only an ordinary toll bridge for wagons and foot passengers was intended, then the words "foot or wagon ways" would have fully expressed the purpose. The use of "road" in addition to "foot and wagon ways" was evidently designed to cover the requirements if a railroad bridge should be built, and the roads necessary to accommodate that character of transportation were railroads. As said in Linton v. Sharpsburg Bridge Co., 1 Grant's Penn. Rep. 414, the necessary incidents of an authority expressly granted, need not themselves be expressed and when an act "authorizes the erection of a bridge, it authorizes the taking of land for abutments, when compensation is also provided for, even though

it be contained in no express terms,'' which is but the statement of an old and long-established rule that a grant of power to accomplish any particular enterprise, and especially one of a public nature, carries with it, so far as the grantor's power extends, an authority to do all that is necessary to accomplish the principal object. [Babcock v. Railroad, 50 Mass. 555.]

So that we are brought to the conclusion that when this bridge company made this application for commissioners to assess the compensation and damages to defendants for these approaches and the necessary tracks to its bridge, the laws of this State expressly conferred upon bridge companies formed under our statutes, the right to condemn private property upon paying the just compensation therefor.

We next inquire, can the plaintiff company avail itself of those laws? By the Act of 1891 (Laws 1891, p. 75; sec. 1024, R. S. 1899), it is provided that, ''Every corporation for pecuniary profit formed in any other State, Territory or country, before it shall be authorized or permitted to transact business in this State, or to continue business therein if already established, shall have and maintain a public office or place in this State for the transaction of its business, where legal service may be obtained upon it, and where proper books shall be kept to enable such corporation to comply with the constitutional and statutory provisions governing such corporation; *and such corporations shall be subject to all the liabilities, restrictions and duties which are or may be imposed upon corporations of like character organized under the general laws of this State, and shall have no other or greater powers,*'' etc.

Section 1025 requires such foreign corporation to file in the office of the Secretary of State its charter or articles of incorporation duly certified, etc.

It is further provided, that ''upon compliance with the above provisions by said corporation, the Secretary of State shall give a certificate that said corporation has

duly complied with the laws of this State, and is authorized to do business therein, stating the amount of its entire capital and the proportion thereof which is represented in Missouri; and such certificate shall be taken by all courts in this State as evidence that the said corporation is entitled to all the rights and benefits of this act, and such corporation shall enjoy those rights and benefits for the time set forth in its original charter, unless this shall be for a greater length of time than is contemplated by the laws of this State," etc.

We have seen that the plaintiff company had filed its articles of incorporation in the office of the Secretary of State and had received its certificate of authority to do business in this State. To the extent that its charter required it to do a business in this State expressly authorized by its charter, to-wit, the construction and maintenance of a bridge over the Mississippi river, this act domesticating it in this State, expressly authorized and empowered it to exercise the rights and powers of like corporations, to-wit, bridge companies in this State, and among those powers we have already shown was that of appropriating lands of private persons or corporations for its road and terminal yards, approaches and abutments.

The language of section 1024, Revised Statutes 1899, is explicit that it "shall be subject to all the liabilities, restrictions and duties which are or may be imposed upon corporations of like character organized under the general laws of this State, and *shall have no other or greater powers,*" i. e., *it shall have those of corporations of like character in this State.*

This statute was first enacted in this State April 21, 1891. The quoted words, the interpretation of which we are now considering, are found in section 26 of the corporation act found in the Revised Statutes of Illinois of 1874, and the clause "and shall have no other or greater powers" had been construed by the Supreme Court of Illinois on two occasions prior to the enactment of our statute. In Barnes v. Suddard, 117 Ill. loc. cit.

241, it was said: "What was intended by the Legislature in the enactment of this provision of the statute? The answer to the inquiry may be found in what was said in Stevens v. Pratt, 101 Ill. 217: 'The manifest and only purpose was to produce uniformity in the powers, liabilities, duties and restrictions of foreign and domestic corporations of like character, and bring them all under the influence of the same law.' From this it would seem that a foreign corporation doing business in this State, possesses *the same* but no greater powers than a corporation organized under our statute. Indeed, the language of the last sentence of section 26, that foreign corporations shall have no greater powers than our domestic corporations, can imply nothing less than they are to *have the same powers.*" [Academy v. Sullivan, 116 Ill. 375; Trust Co. v. Railroad, 173 Ill. 439.] In our opinion the statute is susceptible of no other construction, and having adopted the Illinois statute we presumably intended to adopt the construction placed upon it when we appropriated it. In so far, then, as our own laws govern, the plaintiff finds ample authority in *an express statute* for its condemnation of the lands described for its abutments, approaches, road and terminal facilities.

It is axiomatic that, even if the State of Illinois had conferred upon it express authority to condemn lands for such purposes in this State, that statute would carry no sanction or authority in this State, and without our consent it could not exercise that right within our borders. It is conceded that, notwithstanding the State of its creation and corporate abode did not grant it the power of appropriating, still it was entirely competent for this State to grant it that power, within her jurisdiction, and if we are right in our conclusion that such power has been expressly given it by this State, this would seem to be the end of the matter. No doubt whatever exists that as a general rule a foreign corporation has no extraterritorial existence as such, and can exer-

cise none of the rights conferred by its charter outside of the State creating it, except by the comity of the State in which it essays to act or do business. [Bank of Augusta v. Earle, 13 Peters 588; Railroad v. Koontz, 104 U. S. 12.]

It follows, of course, that foreign corporations are not entitled by their charters to exercise the right of eminent domain, but in the absence of constitutional prohibitions it is competent for the Legislatures of States in which they seek to do business by enabling acts to vest them with this right. [State ex rel. v. Cook, 171 Mo. 348; Railroad v. Lewright, 113 Mo. 660; Railroad v. Telegraph Co., 46 Ga. 43; Dodge v. Council Bluffs, 57 Iowa 560; Gray v. Railroad, 81 Mo. 126; Abbott v. Railroad, 145 Mass. 450; State ex rel. v. Railroad, 25 Neb. 162 and 163.]

But it is asserted that a corporation can not do in this State that which its charter does not authorize it to do in its home, because our own Constitution forbids it, and section 7 of article 12 is cited. That section provides that "no corporation shall engage in business other than that expressly authorized by its charter or the law under which it may have been or may hereafter be organized."

Certainly it is not to be gainsaid that if the plaintiff company should attempt to run a mercantile business or a banking business in this State it could be ousted by quo warranto, but it is doing neither. Its certificate shows it was organized as a bridge company to build a bridge across the Mississippi river and all that it seeks to do in this State is to procure abutments, approaches and roadways as terminals for its business as such bridge company, and it can not be said that it is endeavoring to do a business not authorized by its charter.

Our brethren have considered at great length certain laws of the State of Illinois which were not offered or read in evidence on the trial of this case in the cir-

cuit court, which they concede can not be considered by this court.

The courts of this State will not take judicial cognizance of the legislative acts or statutes of our sister States, or of foreign laws. Where they are relied on as affecting the rights of individuals or property they must be introduced in evidence at the trial. This has been the rule of decision since the first volume of our reported decisions. [Ober v. Pratte, 1 Mo. 80 (1836); Mooney v. Kennett, 19 Mo. 551; Morrissey v. Wiggins Ferry Co., 47 Mo. 521; Flato v. Mulhall, 72 Mo. 522.]

We must decline, therefore, to consider and construe the various statutes of Illinois which our brethren have referred to as showing a want of corporate power in the plaintiff to appropriate lands for its abutments and approaches.

In what condition does this leave the plaintiff?

The general rule that a corporation can not exercise any powers in a State other than that of its creation, is subject to limitations.

Thus in Hitchcock v. The U. S. Bank of Pennsylvania, 7 Ala. 386, the facts were that the bank was chartered under the laws of Pennsylvania, and there was a prohibition in its charter against its taking more than six per cent interest on its loans or discounts. Hitchcock resided in Mobile, Alabama, and there received the money and made his note to the bank, agreeing to pay eight per cent interest. In a suit to forclose the mortgage given to secure this note, the defendants asserted the mortgage was void because the laws of Pennsylvania gave the bank no power to loan money at eight per cent and that the law of the State of its incorporation must govern as to its charter powers. But the Supreme Court of Alabama held that a foreign corporation doing business in that State, and exercising its corporate powers by the comity of that State, must conform to its laws and the prohibition in its charter did not fol-

Vol 174 mo—3.

low it into Alabama, and as the rate was not usurious in the latter State the mortgage and loan were valid.

The same doctrine was reiterated in Frazier v. Wilcox, 4 Robinson's Rep. (Louisiana) 517, in which the Supreme Court of that State quoted the language of Bank of Augusta v. Earle, 13 Peters (U. S.) 519, that "a corporation must dwell in the place of its creation, and can not migrate to another sovereignty. But although it must live and have its being in that State only, yet it does not by any means follow that it will not be recognized in other places; and its residence in one State creates no insuperable objection to its power of contracting in another. . . . Every power, however, of the description of which we are speaking, which a corporation exercises in another State, depends for its validity upon the laws of the sovereignty in which it is exercised; and a corporation can make no valid contract without their sanction, express or implied."

The same ruling was made in Knox v. Bank of The United States, 26 Miss. 655, the court, through Judge HANDY, saying the prohibition against interest exceeding six per cent related to Pennsylvania only. The bank had general power to make loans and if she makes contracts in other States not forbidden by their laws, they are valid.

So in this case the plaintiff produced a charter to build a bridge over the Mississippi river, one end of which was to be in this State. Here is the general authority to build a bridge. It is at once obvious that under this Illinois charter, as such, no power was conferred to either purchase or condemn or hold real estate in this State unless our laws should permit it to do so, but having the right to construct the bridge so far as Illinois could give it, it must depend upon our laws to acquire its abutments, approaches and roadways in this State, and we have given it exactly the same powers to acquire the necessary land for that purpose, which our bridge companies have. The manner of acquiring it is

governed by Missouri laws and to them it is responsible.

Armed as it is with a charter from the State of Illinois to build the specific bridge in question, and having the consent of the United States government in the form of an act of Congress, it must and will be presumed that it has the authority to build a bridge in Illinois, and the maxim *"omnia rite. esse presumuntur"* applies, particularly as the contrary was not attempted to be shown by the defendants upon whom the burden rested.   [7 Am. and Eng. Ency. of Law (2 Ed.), 703.] It follows that in our opinion the plaintiff was entitled to condemn the lands described in its petition for its approaches and necessary roadway, and that the circuit court erred in dismissing its petition.

The evidence leaves no doubt whatever that at the time of the filing of the petition the defendants were the record owners of the property sought to be condemned, and the subsequent alienation of the land sought to be condemned to other parties by the defendants did not render it incumbent on plaintiff to amend its petition, and bring in such subsequent purchasers, but if they desired to do so they should have moved the court for permission to plead, which they did not do. [Phipps v. Railroad, 58 Kan. 142.]   Whatever rights the grantees acquired by such deeds were taken subject to the proceedings to condemn.   [Plumer v. Boom Co., 49 Wis. 449; Drinkhouse v. Waterworks, 87 Cal. 253.]

The plaintiff having the right to condemn, and as the highly important nature of the work is such that it should not be unnecessarily delayed, the judgment of the circuit court is reversed and the cause remanded with directions to the circuit court of Dunklin county to proceed at once to appoint three disinterested commissioners, who shall be freeholders, residents of Scott county, Missouri, to assess the damages which the defendants may severally sustain by reason of such appropriation and to require said commissioners to forth-

with return under oath their assessment of such damages to the clerk of the circuit court of Dunklin county as required by section 1266, Revised Statutes of Missouri 1899, and to take such other and further steps as is required by the statutes in such cases made and provided for the vesting of such abutments, approaches, roadways and yards in the plaintiff company.

*Robinson, C. J., Marshall*, and *Burgess, JJ.*, concur; *Valliant* and *Brace, JJ.*, dissent, and express their views in a dissenting opinion by Judge *Valliant*; *Fox, J.*, not having heard the argument, expresses no opinion.

### DISSENTING OPINION.

VALLIANT, J.—Plaintiff is a foreign corporation seeking to exercise the right of eminent domain in this State.

The petition states that the plaintiff is incorporated under the laws of Illinois "for the purpose of erecting and maintaining a bridge across the Mississippi river from a point near Thebes in Alexander county, Illinois, to a point near Manning's Landing in Scott county, Missouri, with the necessary appurtenances thereto. That said bridge is intended as a railway bridge, and it is necessary for this plaintiff to have a right-of-way for its tracks, bridge and terminal yards," etc. "That for the purpose of carrying out its charter privileges, it is necessary for it to hold and own the following described tract of land." Then follows a particular description of the land desired containing 20.3 acres. It is about two hundred feet wide and extends west from the river bank about two and a half miles to the eastern terminus of the St. Louis & Southwestern Railroad.

The petition states that the land belongs to defendants who refuse to relinquish it and that the plaintiff has made unsuccessful endeavors to agree with them as

to compensation, etc. "That said real estate is necessary for the laying of tracks and the handling of business over and across plaintiff's bridge."

The prayer is for the appointment of commissioners to assess defendants' damages and for general relief.

The case was sent to the Dunklin Circuit Court by change of venue from Scott county. Defendants filed what they called a motion in the Dunklin Circuit Court, which seems to have been treated as an answer, setting up eleven grounds of defense, the chief of which is that the plaintiff is not entitled to the right of eminent domain. It contains also a plea to the effect that prior to the filing of the suit these defendants had sold the land in question and that it had passed into the possession of another railroad company, who had surveyed and laid out its road and was ready to begin the work of construction.

Upon the trial the plaintiff introduced in evidence an act of Congress entitled "An Act to authorize the construction of a bridge across the Mississippi river at or near Grays Point, Missouri," approved January 26, 1901. The first section of this act is as follows:

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Southern Illinois and Missouri Bridge Company, a corporation created and organized under and by virtue of the laws of the State of Illinois, its successors and assigns, be, and the same are hereby authorized and empowered to erect, construct, maintain and operate a bridge and approaches thereto over the Mississippi river from a point on the Mississippi river in Alexander county, in the State of Illinois, opposite the terminus of the Saint Louis Southwestern Railway, at or near Grays Point, in Scott county, in the State of Missouri, or from some other convenient point on said river in said Alexander county, Illinois, to some opposite point on said river in the State of Missouri, within

the distance of three miles above or below the terminus of said railway. Said bridge shall be constructed to provide for the passage of railway trains, and, at the option of said corporation, its successors or assigns, may be so constructed as to provide for and be used also for the passage of wagons and vehicles of all kinds, for the transit of animals, and for foot passengers, for such reasonable tolls as may be approved from time to time by the Secretary of War.''

Plaintiff also introduced in evidence its charter under date December 28, 1900, certified by the Secretary of State of Illinois, whereby it appeared that plaintiff was incorporated under a statute of that State entitled ''An Act Concerning Corporations,'' approved April 18, 1872. The charter declares: ''The object for which said corporation is formed is to erect, construct, maintain and operate a bridge and approaches thereto, over the Mississippi river, from a point on the east bank of the Mississippi river, in the county of Alexander, in the State of Illinois, to a point opposite thereto in the State of Missouri, which said bridge and approaches thereto shall provide for the passage of railway trains, and, at the option of said corporation, its successors and assigns, may be so constructed as to provide for and be used also for the passage of wagons and vehicles of all kinds, for the transit of animals and for foot passengers, for such reasonable tolls as may be approved from time to time by the Secretary of War.''

Then plaintiff produced a certificate from the Secretary of State of Missouri showing that it had complied with the requirements of our law in regard to foreign private corporations (sections 1024-5-6, R. S. 1899) and that it was duly licensed to do business in this State for a term ending December 28, 1950, with all the rights and privileges granted to foreign corporations by our statutes.

A good deal of the testimony related to the plea in regard to the transfer of the land by defendants before

the filing of the suit and the rights of the grantees under that transfer, but the case turned on the first point advanced by defendants, viz., that plaintiff had no right of eminent domain in this State. The trial court decided that point in defendants' favor and rendered judgment accordingly, from which judgment the plaintiff appeals.

The chief question in this case relates to the validity of the claim of a foreign corporation to exercise the right of eminent domain in this State.

Eminent domain is the sovereign power over private property. It is in the United States for all necessary purposes of the Federal Government; it is in the State for all other public uses. It can be exercised by no one except by express authority from the sovereign, and then only for a public use. Therefore, when a corporation, whether domestic or foreign, comes claiming the right to take private property for its corporate use, it must show not only that that is a public use but also that the lawmaking power of the State has conferred that right on the corporation. Nor does the mere fact that a corporation finds it impossible otherwise to carry out the purposes for which it was chartered give it the right to take private property without the owner's consent. It is unlikely that a railroad could be built through the State if the right of way could be obtained only by consent of the landowners, yet that fact would not give the railroad company, though a domestic concern, the right to condemn land. That right in railroad companies exists only in express grant by the Legislature.

If the plaintiff has the right to condemn the land it seeks to acquire in this suit, it can point to the statute that confers that right and this it has undertaken to do. We are first referred to the Illinois statute under which plaintiff is incorporated, then to our statute authorizing the incorporation of bridge companies, and lastly to our statute admitting foreign corporations to do business in this State. If the plaintiff has the right claimed, it is to be found in the concurrence of those statutes.

The act of Congress in evidence does not purport to confer on the plaintiff this right; it is a grant only of permission to build the bridge over the river.

Defendants make the point that plaintiff did not introduce the Illinois statutes in evidence and that therefore this court can not take cognizance of them. That seems to be the fact and the point is probably well made. Without the Illinois statutes we have in evidence only the charter creating the plaintiff a bridge company, and we are asked to say that a bridge company in Illinois, when it has conformed to our statute in relation to foreign corporations, is entitled to exercise in this State the same powers that are given to a bridge company chartered under our law, without regard to what powers it has under the laws of its own home. If that is a correct proposition, then even though the plaintiff has no right under the laws of Illinois to do what it seeks to do here, yet it can do so in this State if our statute gives such right to a domestic bridge company. That can not be correct. If it be conceded that our statute confers on a foreign corporation admitted to do business in this State all the powers that a domestic corporation of like character has, still that concession must not be understood to mean that the foreign corporation can do in this State that which its charter did not authorize it to do in its home. Our Constitution forbids that. ''No corporation shall engage in business other than that expressly authorized by its charter or the law under which it may have been or hereafter may be organized.'' [Art. 12, sec. 7.] A corporation can not go out of its State to do business unless its charter, by implication at least, permits it, nor, even if so permitted, can it go into another State unless by leave and license of that State. The Supreme Court of the United States has said: ''A corporation 'must dwell in the place of its creation and can not emigrate to another sovereignty' (Bank of Augusta v. Earle, 13 Pet. 588), though it may do business in all places when its charter allows and the the local laws do

not forbid.  [Railroad v. Koontz, 104 U. S. 12.]  But wherever it goes for business it carries its charter and the charter is the same abroad as it is at home.  Whatever disabilities are placed upon the corporation at home it retains abroad, and whatever legislative control it is subject to at home must be recognized and submitted to by those who deal with it elsewhere.''  [Railroad v. Gebhardt, 109 U. S. 537.]

It would doubtless be within the power of a State to say through its Legislature that a foreign corporation coming into its territory may have greater powers than those given by its charter at home, but that has not yet been done in this State.  At home or abroad a corporation is bounded in its powers by its charter.  And a mere similarity in character of business does not authorize a corporation to do what its charter does not so authorize.  For example, a corporation organized under section 1351, Revised Statutes 1899, for the express purpose of building a bridge over the Gasconade river in Gasconade county would not be authorized to build a bridge over the same river in Maries county nor over the Illinois river in Jersey county, even if Illinois has a law like ours inviting foreign corporations to come into that State and transact the business for which they are incorporated.  A corporation chartered under a special act of the Legislature has its powers defined in the act, but when it is chartered under a general law we must look to that law for the extent and limitation of its rights.  Neither its articles of association nor the certificate of the Secretary of State can confer a franchise not contained in the legislative act.  In this condition we do not see how we can get along with the plaintiff's case unless we look into the Illinois statutes to see what authority they confer, and although the plaintiff did not introduce those statutes in evidence and, therefore, perhaps, we have no right to pursue the subject further, yet they are referred to in the briefs of counsel,

and it would doubtless be more satisfactory to both parties if we should go to the bottom of the matter.

The only statutes of Illinois to which we are referred are the Act of April 10, 1872, entitled "an Act for the incorporation of Bridge Companies," and Revised Statutes Illinois 1899, page 1693, section 16. The first section of the Act of 1872 referred to is: "That any number of persons, not less than ten, may form a company for the purpose of constructing and maintaining a bridge over any of the streams of water (or any part of such streams) situated within the State of Illinois, or upon the boundary thereof, for public use, for the crossing of persons or property, and for that purpose may sign . . . articles of association, in which shall be stated the name of the company . . . the purpose for which it is to be used, whether for railroads or ordinary travel, or both," etc.

Section 2 of the act provides that when it becomes necessary to appropriate lands belonging to private persons or corporations "to the uses of said company" the same may be condemned "in such manner as may be provided by the laws of the State of Illinois for the taking of private property for public or corporate purposes."

Section 3 authorizes the corporation so created to issue bonds, etc., and to consolidate with any bridge company in that State or "any bridge company organized under the laws of an adjoining State."

The three sections quoted of this act are so nearly identical with sections 16, 17 and 18, p. 370-1 of our General Statutes of 1865, as to indicate that the one is copied from the other. Since that date, however, our statutes on this subject have undergone material changes, and so perhaps have the Illinois statutes, but our inquiry into the latter has gone no further than we have been led by the briefs of counsel.

Section 1, chapter 32, Revised Statutes Illinois 1899 (Hurd), provides for the formation of corporations for

any lawful purpose, except for certain purposes mentioned, among which the business of railroad companies is, but that of bridge companies is not, included, and declares that corporations formed for the purpose of constructing railroad bridges are not to be held to be railroad corporations.

The plaintiff corporation was organized in December, 1900, therefore, it derives its charter powers either from the Act of 1872 or the Revised Statutes 1899. The charter refers to the Act of 1872 and its amendments as its authority, without specifying what the amendments are, and we are not otherwise referred to them.

The Act of 1872 does not authorize, either expressly or by implication, the formation of a corporation to transact the business of building and maintaining bridges in general, at home and abroad, but it limits the purpose to the building and maintaining "a bridge over any of the streams of water (or any part of such streams) situated within the State of Illinois or upon the boundary thereof." That is, if the stream is within the State, the corporation is chartered to build and maintain a bridge over it, if it is upon the boundary of the State, the charter is to build and maintain the bridge over that part of such stream which is within the State, and for the rest it may consolidate with a corporation organized under the laws of the adjoining State. If it be said that it is unreasonable to suppose that men would build a bridge to the middle of the river if they could go no further, the answer is that the language of the statute "or any part of such streams situated within the State," etc., is meaningless unless it means to so limit the power and is not unreasonable when taken in connection with the subsequent provision looking to a consolidation of the franchise with that of a corporation of the adjoining State. It must be remembered also that that statute was enacted in 1872 and the Supreme Court of the United States had not then decided, as it has since, that Congress under its power to regulate in-

terstate commerce could charter a corporation to build
and maintain a bridge over a navigable river dividing
two States and confer upon it all powers necessary to its
purpose, including the right to condemn land. [Luxton
v. North River Bridge Co., 153 U. S. 525.] And the
changes in our statutes since that date also indicate
that the law on this subject has developed and is better

If the plaintiff finds its charter powers in the Act
of 1872, those powers, *ex vi termini,* are confined to the
State of Illinois and therefore our statute dictating the
terms upon which foreign corporations may come into
the State has no application to the plaintiff.

What is just said of that act is not altogether free
from the criticism that it is a narrow construction. But
the plaintiff is not in a position to demand a very liberal
construction. It is in the act of invading the defend-
ants' enclosure, and if it would justify its course it must
point to a charter of no doubtful meaning.

The learned counsel for plaintiff do not in their
briefs say that they stand on the Act of 1872, neither
do they say that they derive their charter powers from
the Revised Statutes of Illinois of 1899, though they do
refer to section 14, page 1693, Revised Statutes 1899,
as the source of their right of eminent domain. The
claim is presented in general terms that plaintiff is in-
corporated as a bridge company under the laws of Illi-
nois, that it had complied with our statute in regard to
foreign corporations, and is therefore entitled to all the
powers to which a bridge company organized under the
laws of this State is entitled. That position assumes
that a similarity in names implies a similarity in char-
acter, which is not always true.

Similarity in character of charter powers in such
case is essential. For example, a corporation chartered
under the laws of Illinois to establish and maintain a
ferry would not, on complying with our laws in regard
to foreign corporations, be entitled to build and main-

tain a bridge in this State. And so a corporation char-
tered in Illinois to build and maintain a bridge of a
particular character different from that contemplated
by our bridge statute would not, by complying with our
law in reference to the admission of foreign corpora-
tions, be entitled to exercise the corporate rights of a
Missouri bridge company. Therefore, if a bridge com-
pany, chartered under the laws of this State, can con-
demn land for the purposes stated in the plaintiff's pe-
tition (as to which we will presently inquire), the plain-
tiff must show that it has like powers in the State of its
creation before it can be admitted to exercise such
powers in this State. The articles of association and
certificate of the Secretary of State are all that we have
in evidence to show what charter powers the plaintiff
has, and we are left to grope through unfamiliar stat-
utes to see what rights are conferred.

The provision of the Illinois Revised Statutes of
1899 (sec. 1, chap. 32) above referred to, is broad
enough in its terms to include a corporation created for
the purpose specified in the plaintiff's charter, that is,
building a railroad bridge, and if that chapter is to be
construed as superseding the Act of 1872, then we are
to look to that chapter of the Revised Statutes of Illi-
nois for the specification of the plaintiff's charter
rights. In that chapter mention is made by name of
railroad bridge companies, but it is there declared that
they are not to be held to be railroad companies; there-
fore, they can not claim the right of eminent domain
which is given to railroad companies, and there is no
authority conferred on them in that chapter to condemn
private property for their use. The learned counsel
in their briefs refer to section 14, chapter 137, Revised
Statutes Illinois 1899, p. 1693, as the clause which con-
fers that authority. That section is part of an act en-
titled "An Act to revise the law in relation to toll
bridges," approved March 23, 1874, and forms chapter
137, Revised Statutes Illinois 1899, and must be con-

strued as relating to the bridges called for by that act. In fact, the language of the section relied on expressly limits the right to toll. bridges "erected pursuant to this act." The section is: "When it shall be necessary, for the establishment, erection, repair, extension or reconstruction of any toll bridge of public utility (including all necessary approaches thereto) that may be authorized to be established or erected pursuant to this act, or which may have been heretofore erected, to take or damage private property therefor, the same may be done, and the compensation therefor ascertained, in the manner then provided by law for the exercise of the right of eminent domain."

Reading the chapter of which that section is a part, we see that it relates only to toll bridges to be used for ordinary travel through the county roads. The authority to erect the bridge is to be granted only by the county board; it may be granted to individuals as well as to corporations, but the owners of the land to be occupied are to be given the preference if they desire the franchise; the county board is to fix the rate of toll (not the Secretary of War, as in the plaintiff's charter) and may condemn it and make it a free bridge for public use. There is not anything in the whole chapter to indicate that an interstate railroad bridge, or a railroad bridge of any kind is contemplated, and the only authority to condemn land given in that chapter is to do so for the purposes of such a bridge and its approaches as contemplated by that statute. The plaintiff derives no right of eminent domain from that source.

The learned counsel in their brief quote Revised Statutes of Missouri, 1899: "Sec. 1315. No corporation organized or incorporated under the laws of any other State shall do business in this State if such corporation if organized in this State would organize under article 9 of chapter 12 of the Revised Statutes, or acts amendatory thereof, without first procuring a license therefor, which license shall be granted by the

Secretary of State;'' then they say that if plaintiff had organized in this State it would have organized under article 9 of chapter 12.

If the plaintiff derives its corporate powers from the Illinois Act of 1872, and if our interpretation of that act is correct, then the plaintiff is limited to do a particular act in a particular place and has no roving charter, and if it should have been chartered under the terms of acticle 9 of chapter 12 of our Revised Statutes to do what the plaintiff seeks in this suit to do, it would have been chartered to do what the Illinois Act of 1872 did not authorize it to do.

The plaintiff's articles of association in evidence declare that the object of the corporation is to erect and maintain a bridge and its approaches over the Mississippi from a certain point in Illinois to a certain point in Missouri, ''which said bridge and approaches thereto shall provide for the passage of railway trains and, at the option of said corporation, its successors and assigns may be so constructed as to provide for and be used also for the passage of wagons and vehicles of all kinds, for the transit of animals and foot passengers for such reasonable tolls as may be approved from time to time by the Secretary of War.''

When a charter is granted to a corporation to erect and maintain a work of public utility, and the extraordinary power of eminent domain is conferred to be used in that connection, the franchise carries with itself the corresponding obligation to perform the work of public utility contemplated in the grant, and a failure to do so would sustain a move on the corporation to oust it of its franchise.

By the terms of its charter above quoted, the only bridge the plaintiff is required to erect and maintain is one for the passage of railroad trains; it may at its option provide also a passage for ordinary travel, but is under no obligation to do so and its corporate rights could not be annulled by its absolute refusal to do so.

The power to regulate tolls is vested only in the Secretary of War; the State has no control over it. Is that the kind of corporation that is contemplated in article 9, chapter 12 of our Revised Statutes?

It has been decided by the Supreme Court of the United States that Congress, in the name of interstate commerce, has power to incorporate a company to build such a bridge as the plaintiff purposes, and to clothe the corporation with the necessary right of eminent domain. [Luxton v. North River Bridge Co., supra.] But plaintiff is not incorporated under an act of Congress, and does not claim charter powers from that source. It claims that it is chartered by the laws of Illinois, that it is a bridge company, and that as such it is entitled to all the rights, including that of eminent domain, that a bridge company chartered under section 1351 of our Revised Statutes 1899, has, and this it claims under the provisions of sections 1315 and 1316.

Private foreign corporations organized for business purposes are by comity admitted into our State and allowed to transact here the business for which they were incorporated. The statute just referred to imposes certain conditions upon such corporations as precedent to their admission, and when those conditions are complied with they are allowed to come as before; perhaps it would not be too much to say they have then a right to come. But if the permission to come is converted into a right to come, it is only a right to do what was before permitted, that is, to transact the business for which the corporations were chartered. If the right of eminent domain was permitted by comity before, it may be exercised to the same extent since the enactment, but if it was not permitted before, it is not granted by the statute. The exercise of the right of eminent domain is not a part of the business of the corporation. It is often essential in the equipping of a corporation to enable it to do business, but it relates to its organization and not its operation. The right of eminent do-

main, is not conferred by comity and has never been exercised except by express legislative grant in this State.

The following from Thompson on Corporations is a correct statement of the law and is well supported by authority:

"The power of a private corporation to acquire private property for the public purposes for which it may have been chartered, is a power which comes to it alone through the delegation of the State of its sovereign right of eminent domain. The power can not, therefore, be exercised by a foreign corporation on a mere principle of comity, because it will never be presumed, in the business of affirmative legislation, that the State delegates any part of its sovereignty to a foreign corporation. It may be stated with confidence in every case that this power can not be exercised by a corporation created under the laws of one State or country, without the consent of the Legislature of that other State or country, affirmatively expressed. Nor will the power to take land by the right of eminent domain which has been granted by the Legislature of a State to a domestic corporation, pass to a foreign corporation, which succeeds by deed to the rights and powers of the domestic corporation, without the assent of the Legislature of the domestic State." [6 Thompson on Corp., p. 6310; State v. Railroad, 25 Vt. 442.]

A railroad company owning in an adjoining State a railroad projected into Missouri may exercise the right of eminent domain here, the same as a domestic railroad company, because our statute affirmatively grants that power (Section 1060, R. S. 1899; Gray v. Railroad, 81 Mo. 126; Railroad v. Lewright, 113 Mo. 660), but without that grant even a railroad company would have no such power, notwithstanding the general policy of comity which we have always extended to foreign corporations, and notwithstanding the fact that

Vol 174 mo—4.

the exercise of the right of eminent domain might. be absolutely necessary to enable it to do business.

Therefore, even if a bridge company, chartered under section 1351 of our Revised Statutes, had the right of eminent domain for such purposes as the plaintiff seeks, the plaintiff has not such right, for the reason that there has been no legislative grant of such power to a foreign corporation of that kind. The Illinois cases referred to in the briefs for plaintiff, construing a statute of that State like ours in regard to the admission of foreign corporations to do business, only relate to the right of such corporations to transact the business for which they were chartered; they have no reference to the right of eminent domain. [Stevens v. Pratt, 101 Ill. 217; Female Academy v. Sullivan, 116 Ill. 375; Barnes v. Suddard, 117 Ill. 237; Farmers Loan Co. v. Railroad, 173 Ill. 439.]

But a domestic corporation chartered under section 1351 has not the right of eminent domain for such purposes as and to the extent to which the plaintiff seeks to use it.

We have seen that sections 16, 17 and 18, p. 370, General Statutes 1865, are almost identical with the three sections of the Illinois Act of 1872. Those sections were added to our statutes authorizing the organization of corporations for manufacturing and business purposes in the revision of 1865. And although they are added to and made a part of the chapter entitled: "Of manufacturing and business companies," the second section of which prescribes the form of the articles of association, yet when these three sections are added the first of them (section 16) prescribes another form of articles of association in which it is required to be stated, inter alia, "the purpose for which it [the bridge] is to be used, whether for railroads or ordinary travel, or both." The next section confers the power on such corporation to condemn land "to the uses of said company."

Those sections included in their contemplation the building and maintaining a railroad bridge and the condemning of land for such purpose, and railroad bridge companies have been formed and are now lawfully exercising charter powers under that statute. [Bridge Co. v. Schaubacker, 49 Mo. 555; Bridge Co. v. Ring, 58 Mo. 494.] But the law has since been changed and all that remains of section 16 now is section 1351: "Any number of persons, not less than ten, may form a company for the purpose of constructing and maintaining a bridge over any of the streams of water or any part of such streams which may be within this State, for public use, for the crossing of persons or property, according to the provisions of this article."

All reference to a railroad bridge is cut out, and the only bridge authorized is one "for public use, for the crossing of persons or property." A railroad bridge is, *sub modo,* a bridge "for public use for the crossing of persons or property," but it is not such a bridge in the unlimited meaning of the term. The intention to eliminate bridges for railroad purposes is indicated also in the change of the provision for condemning land. Section 1352 takes the place of section 17 of the statute of 1865, which authorized the corporation to condemn land for "the uses of said company," whereas section 1352 specifies that the land shall be taken only "for approaches, road, foot or wagon ways of such bridge corporation." Contrast the purposes there specified with those for which the plaintiff in its petition demands the right to condemn the land of these defendants, viz., "for its railway tracks, bridge and terminal yards," etc. Again: "That said real estate is necessary for the laying of tracks and the handling of business over and across plaintiff's bridge." The demand is for land two hundred feet wide and extending two and a half miles westward from the bank of the river. Is that the purpose for which our statute authorizes a bridge company to condemn land?

If the bridge contemplated is merely an appurtenance to a railroad, then it may be built by the railroad company which has the right to condemn land "for its railway tracks, bridge and terminal yards," etc., but if the bridge for the passage of railway trains is the main purpose, then the corporation's function is performed when it provides means for the passing of trains that come to it; it has no authority to project its lines of railway through the country to touch railroads at the distance to which this company seeks to go.

When the provisions of the General Statutes of 1865 were in force, the Constitution forbade the incorporation of a bridge company by special charter. [Sec. 27, art. 4, Const. 1865.] But the Constitution of 1875 authorized the incorporation of companies by special act to construct bridges over rivers forming the state boundary. [Sec. 53, art. 4, Const. 1875.] We are not aware of any such special act of the General Assembly, but the removal of the previous constitutional limitation on the legislative power rendered the provision by general statute for the formation of interstate bridge companies unnecessary, and it may have influenced the alteration in the statute in question. The change in the law of 1865 was made in the revision of 1879 which left it as it now is in section 1351, Revised Statutes 1899. Railroad companies under the law of 1865 had the same right they now have to build railroad bridges over rivers in this State, and by the Act of 1895 they now have the right to build toll bridges for ordinary travel in connection with their railroad bridges. [Sec. 1035, R. S. 1899.] So that we are not without statutory provisions to enable us to build all the railroad bridges and bridges for ordinary travel in connection therewith that may be desired, even if we should hold that section 1351 calls only for bridges for ordinary travel. With the powers given the railroad companies under the sections above referred to, and those given bridge companies under sections 1351 and 1352, there is no deficiency in legislative

enactments for the building and maintaining of all kinds of bridges that the convenience of the public may require. It is not necessary in this case to say whether or not a bridge company organized under section 352 could build and maintain a bridge for the passage of railway trains in addition to its roadway for ordinary travel, but we do say that the section contemplates a bridge, "for public use for the crossing of persons or property" in the unrestricted sense of that term; that that is the purpose for which the right to condemn private property is given, and that a bridge designed for railroad traffic only falls short of the call of that statute, and that the power to condemn land conferred in section 1352, "for approaches, road, foot or wagon ways" does not authorize the company to condemn land two hundred feet in width extending two and a half miles beyond the bank of the river for "its railway tracks, bridge and terminal yards," etc.

This is the view the learned trial court took of this case and its judgment ought to be affirmed.

*Brace, J.,* concurs in this opinion.